RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 10a0224p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
                *Plaintiff-Appellee,*

    *v.*

ROGER FAULKENBERRY,
                *Defendant-Appellant.*

Nos. 08-4233/4404

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 06-00129-004—Algenon L. Marbley, District Judge.

Argued: October 8, 2009

Decided and Filed: July 28, 2010

Before: SUTTON, KETHLEDGE, and WHITE, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** Martin G. Weinberg, LAW OFFICES, Boston, Massachusetts, for Appellant. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Martin G. Weinberg, LAW OFFICES, Boston, Massachusetts, for Appellant. Nina Goodman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

————————————

**OPINION**

————————————

KETHLEDGE, Circuit Judge. What is not seriously disputed in this appeal is that National Century Financial Enterprises (NCFE) defrauded its investors of more than $2.4 billion. What is disputed is whether Roger Faulkenberry participated in the fraud. The jury in this case concluded that he did, convicting him of securities fraud, wire fraud, money laundering, and conspiracies to commit all of those crimes. Faulkenberry now appeals, primarily challenging the sufficiency of the evidence supporting each conviction. We

1

conclude there was ample evidence to vindicate the jury's finding of guilt as to the fraud counts. But money laundering is a different animal than fraud; and we conclude that the government did not prove money laundering here. We therefore affirm Faulkenberry's fraud convictions, reverse the money-laundering ones, and remand the case for resentencing.

I.

A.

NCFE's business was to purchase, at a discount, the accounts-receivable of healthcare providers. The transactions were supposed to proceed as follows: First, NCFE would pay the provider approximately 80% of the receivable amount up front, in return for ownership of the receivable. NCFE would then put approximately 17% of the receivable amount into a "reserve account" in an NCFE subsidiary's name, and keep the remaining 3% for itself. The purchases thereby afforded providers immediate cash flow; and in theory, they generated profits for NCFE in the amount of the discount and certain fees it charged the providers.

Of course, NCFE itself needed cash to make the purchases; and to that end, it sold bonds to investors, mostly (if not entirely) institutional ones. NCFE made very specific representations to investors in connection with those sales. First, it told them that invested funds would be used only to purchase "eligible receivables." Those receivables, in turn, would serve as collateral for the amounts that NCFE itself owed its bondholders. Thus, for every dollar of investor money that NCFE wired to providers, the investors would gain a dollar's collateral—in the form of an eligible receivable—to secure NCFE's own obligation to repay them. Indeed the investors would gain more than that: Since the entire amount of a purchased receivable would serve as collateral, but (as discussed above) NCFE would wire the provider less than that amount, the investors would be overcollateralized to the extent of the difference. NCFE told investors as much expressly.

Second, NCFE told investors that it would maintain "reserve accounts" equal to 17% of each provider's "outstanding Purchased Receivables." That meant investors would be doubly protected: As discussed above, NCFE's obligation to repay them would be collateralized by eligible receivables; and to the extent any receivables went unpaid, NCFE

could then withdraw the unpaid amount from a reserve account, thereby making itself, and ultimately the investors, whole.

Third, NCFE defined eligible receivables to include only ones that were tied to services performed on a specific patient on a specific date, and that were less than 180 days old as measured by the date on which the patient was served. None of the receivables serving as investor collateral, therefore, would be stale. And fourth, NCFE promised to honor certain "concentration limits," which diversified investor risk by limiting the percentage of investor funds that NCFE could allocate to a single provider. As a result of these representations, NCFE raised billions of dollars from investors.

The record before us makes unmistakably clear that NCFE's representations were false. NCFE executives lied to investors in sales presentations; they lied to them in the governing documents for bond sales; and they lied to them in monthly investor reports that showed NCFE in full compliance with the obligations recited above. This practice of deception was continuous from approximately 1995 to October 2002, when NCFE ceased operations.

The deception centered on the practice of "advancing." Contrary to what it told investors, NCFE routinely advanced funds to healthcare providers without obtaining any receivables, much less eligible ones, in return. NCFE apparently just fronted these monies—investor monies—with the hope that someday the provider would pay them back. Indeed, some providers were already so buried in debt that even the hope must have been absent. Moreover, the advances were large and focused on only a handful of providers, which meant that NCFE blew past its concentration limits as well.

The advances' effect, over time, was to render NCFE's investors increasingly undercollateralized. For example, a memorandum dated August 7, 2002—on which Faulkenberry was the only cc—states that California Psychiatric Management Services, Inc. owed NCFE nearly $50 million, which was backed by only about $2 million in receivables, leaving almost $48 million uncollateralized. The collateral shortfall for Consolidated Health Corporation, Inc., was more than $120 million; for Doctors Community Healthcare Corporation, more than $486 million; for Homecare Concepts of America, Inc., more than $614 million; for MED Diversified, Inc., almost $136 million; for Medshares, Inc., $129

million; for Millenium Health Group, Inc., $136 million; for Pain Net, Inc., more than $71 million; for PhyAmerica, L.L.C., almost $115 million; and for Scott Medical Group—one of whose transactions looms large here—more than $132 million. These providers did not themselves, of course, make any representations to NCFE's investors. But measured by what NCFE represented to investors, this was fraud on a massive scale.

The fraud was compounded by other protections that NCFE claimed to provide investors. The bonds' governing documents required that investor monies be deposited in accounts in the names of two of NCFE's subsidiaries, NPF VI and NPF XII. To monitor those accounts, the documents created Trustees—JP Morgan Chase (for NPF VI) and Bank One (for NPF XII)—both of which the SEC later fined for their derelictions in that role. Per the bonds' master indentures, the Trustees could wire funds to providers only to the extent that NCFE documented that it was obtaining eligible receivables in return. But NCFE evaded this limitation by submitting a phony Receivables Purchase Report to the Trustees for every advance.

The governing documents also required NCFE to submit, to the investors and Trustees, monthly reports demonstrating its compliance with all the obligations described above. To that end, NCFE had a "Director of Compliance," Sherry Gibson, who testified at trial that every such report, from 1995 until NCFE's collapse in 2002, was falsified: "The data would be manipulated in any way necessary in order to make compliance on the report." She further testified: "I added receivables to the data, I changed the aging categories, I added payor information, I manipulated the reserve accounts."

One document, Government Exhibit VII-21, illustrates the falsification in brazen detail. That document sets forth, in two columns for easy comparison, the "reported" and "actual" data for NPF VI's August 2002 investor report. In the reported column, most of the line entries relating to NPF VI's compliance with the obligations described above are falsified. Marginal notations along the actual column explain how and why: The value of outstanding receivables "was overstated by $210,720,030" to match up with the amount owed by providers; in the "Concentration Limits" section, the amounts owed by some providers were "understated to comply" with those limits, the amount for others was "overstated to compensate for ineligible receivables[,]" and "[p]rovider names are

misreported as well"; and in the "Receivables Aging" section, literally every line entry was falsified ("[a]ll buckets misreported"), in part to report roughly $86 million of stale receivables as being ones that were less than 180 days old.

NCFE also misrepresented the amount of funds in its reserve accounts, albeit in a different way. Those accounts were held, respectively, in the name of NPF VI and XII, and subject to Trustee oversight. Advancing left NCFE without adequate means to fund the accounts, so by 2000 their balances were well short of the requisite 17% of "outstanding Purchased Receivables." Meanwhile, the Trustee for each NPF account "tested" the sufficiency of its balance on a designated day of each month. NCFE arranged for the NPF VI and XII testing to be conducted on different days, however, and then shifted funds between the accounts as necessary to make each account appear to have sufficient funds on its testing day. That shifting—first to one NPF entity, and then back to the other—occurred every month from approximately 2000 onward. The amounts shifted were large: NCFE would routinely shift more than $100 million from one NPF reserve account to the other, and then shift the money back a few days later. By 2002, NCFE had to transfer all of its reserve funds from one account to the other to hide the shortages.

Finally, on September 30, 2002, a Trustee bank refused to shift funds from one NPF account to the other. That refusal triggered a cascade of events that revealed the full extent of NCFE's fraud to its investors. NCFE declared bankruptcy in November 2002, resulting in investor losses of approximately $2.4 billion.

B.

That NCFE defrauded its investors, of course, does not necessarily mean that all of its executives participated in the fraud. The executive before us in this appeal is Roger Faulkenberry. He joined NCFE in 1994 and became its Director of Securitizations the following year. In August 2001, Faulkenberry became NCFE's Executive Vice-President for Client Development.

The government indicted Faulkenberry after NCFE's collapse, and tried him with four co-defendants in the United States District Court for the Southern District of Ohio. The jury convicted Faulkenberry of every charge for which he was indicted, to wit: four counts

of securities fraud, and one count each of wire fraud, conspiracy to commit securities fraud and wire fraud, conspiracy to commit money laundering, and money laundering. The district court sentenced Faulkenberry to five years on each of the conspiracy, securities-fraud, and wire-fraud counts, and ten years on the conspiracy to commit money-laundering and money-laundering counts, with all sentences running concurrently. The district court also ordered Faulkenberry to pay restitution in the amount of $2.4 billion.

This appeal followed.

## II.

Faulkenberry challenges the sufficiency of the evidence supporting each of his convictions. When reviewing a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

At the outset, we address an overarching argument that Faulkenberry makes with respect to all of his fraud-related convictions. He observes that each of those convictions requires a misrepresentation; and he contends that there were none, because in his view the bonds' governing documents fully disclosed NCFE's practice of advancing. But that contention ignores most of the relevant evidence and views the rest in the light most favorable to Faulkenberry. It is true that the documents contemplated limited *pro forma* funding—that is, weekly disbursements to certain providers who were themselves paid a flat rate each month (*e.g.*, nursing homes) and who assigned their flat-rate receivables to NCFE at the end of each month. But that narrow class of funding hardly opened the door to unrestrained advances secured by nothing at all. Even the *defendants'* expert witness conceded that the advances alleged here—weekly disbursements to sellers who were already over-funded—were prohibited under the governing documents. Moreover, several of Faulkenberry's colleagues testified that the governing documents neither disclosed nor permitted advancing. Meanwhile, Faulkenberry overlooks several pallet-loads of misrepresentations—relating to NCFE's reserve accounts, concentration limits, and receivables-aging—not to mention the outright falsifications churned out each month by the Compliance Department. So we reject his argument.

We next turn to Faulkenberry's arguments specific to each count.

A.

Faulkenberry challenges the sufficiency of the evidence supporting his conviction for wire fraud, in violation of 18 U.S.C. § 1343.  That section provides in relevant part: "Whoever, having devised . . . any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, [or] representations . . . transmits or causes to be transmitted by means of wire . . . in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice," shall be subject to imprisonment.

The statute requires proof of three elements.  The first is often described merely as that there have *been* a scheme to defraud; but that overlooks the question of the defendant's relation to the scheme.  The statute's terms suggest that he must have "devised" it, but all of the circuits to have decided the issue agree that willful participation is enough.  *See, e.g.*, *United States v. Stull*, 743 F.2d 439, 442 (6th Cir. 1984) (mail fraud) ("The government is not required to prove that each defendant was a mastermind of the scheme to defraud; proof of a defendant's willful participation in a scheme with knowledge of its fraudulent elements is sufficient"); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) ("Although both the mail fraud and the wire fraud statutes . . . contain the language 'whoever, having devised or intending to devise any scheme or artifice to defraud[,]'" participation is enough to convict under either); *United States v. Yefsky*, 994 F.2d 885, 891-92 (1st Cir. 1993) ("The defendant need not instigate the scheme so long as he willfully participates in it, with the knowledge of its fraudulent nature and with the intent to achieve its illicit objectives").

The first element of wire fraud, then, is that the defendant devised or willfully participated in a scheme to defraud.  The second is that he used or caused to be used an interstate wire communication "in furtherance of the scheme"; and the third, that he intended "to deprive a victim of money or property."  *United States v. Prince*, 214 F.3d 740, 748 (6th Cir. 2000).

We consider these elements in turn.  A scheme to defraud is "any plan or course of action by which someone intends to deprive another . . . of money or property by means of false or fraudulent pretenses, representations, or promises."  *United States v. Daniel*, 329

F.3d 480, 485 (6th Cir. 2003) (internal quotation marks omitted). As described above, there was a massive scheme to defraud here. The question is whether Faulkenberry willfully participated in it.

The jury had ample reason to conclude that he did. As an initial matter, Faulkenberry's job responsibilities placed him in close proximity to the fraud. As NCFE's Director of Securitizations, Faulkenberry was responsible for "managing relationships with existing investors and bringing in new investors." Later, as Executive Vice-President for Client Development, Faulkenberry "acted as a primary contact for both investors and rating agencies[.]"

Other evidence showed that Faulkenberry knew full well about the fraud. That evidence reached back to late 1996, when William Parizek was hired to be NCFE's Director of Corporate Finance. Parizek promptly discovered that the company's representations to investors were untrue. He confronted Faulkenberry about that fact, but Faulkenberry did nothing. Parizek then quit the company after being there ten weeks, despite having moved his family from Kansas to Ohio for the job. Similarly, NCFE's Associate Vice-President of Funding, Jessica Bily, testified that she copied Faulkenberry on a memo expressing concerns that NCFE was not complying with its obligations to investors. Faulkenberry never responded.

Sherry Gibson, who as Director of Compliance played a key role in the fraud, testified that she "specifically spoke with Roger Faulkenberry" about the falsified investor reports. The conversations were frequent. She explained:

> Usually I was complaining about the work that was involved in trying to manipulate the data and the fact that the advances were going out the door and that there were problems that had to be manipulated—that data had to be manipulated because of these advances and other problems.

> Those would be the types of conversations that I would have with Roger Faulkenberry.

Another e-mail from Gibson to Faulkenberry, among others, stated that the figures in the investor reports were "considerably out of sync with reality" and that "some effort needs to be made to curtail any and all overfunding." Gibson further testified that Faulkenberry was on a "short list" of principals and executives to whom she provided information about

NCFE's noncompliance with its obligations to investors. To that end, in 1998 Gibson sent Faulkenberry a memorandum—labeled "FOR YOUR EYES ONLY"—that compared accurate data with falsified data she had sent to rating agencies. Gibson also sent Faulkenberry the two-column ("actual" and "reported") NPF VI investor report for August 2002, discussed above. And she testified that Faulkenberry was her closest colleague at NCFE.

There was direct evidence, too, of Faulkenberry's participation in the fraud. First, Jon Beacham, who succeeded Faulkenberry as Director of Securitizations at NCFE, testified that Faulkenberry provided false information to investors during presentations. Second, Faulkenberry sent Gibson an email requesting "smoothed"—*i.e.*, falsified—concentration-limit data to forward to outside rating agencies. Third, Faulkenberry told Gibson that a particular power-point slide—which contained *accurate* data about collections on purchased receivables—should be removed from NCFE's investor presentations. That slide was problematic, Gibson recalled, because it might allow "investors [to] catch on that the volume of . . . collections is much smaller than the volume of purchases[.]" Fourth, Faulkenberry attended meetings where he and Gibson, among others, figured out how best to falsify investor reports. And fifth, Faulkenberry personally authorized approximately 25 advances of investor funds—in amounts totaling tens of millions—to health-care providers. Suffice it to say the government proved that Faulkenberry participated in a scheme to defraud investors.

Next comes the question whether Faulkenberry used or caused to be used a wire communication in furtherance of the scheme. The essence of NCFE's fraud, of course, was its lies to investors; and so here one might expect to see some interstate wire communication to an investor. But we do not see that. Instead, the government indicted Faulkenberry for an interstate fax to a Trustee, in the form of a phony Receivables Purchase Report, dated April 19, 2002. There is no evidence that Faulkenberry himself sent the fax, but there is plenty of evidence (in the form of email traffic) that he caused it to be sent. The question, then, is whether the fax was in furtherance of the fraudulent scheme. The fax itself did not directly cause investors to part with their money—NCFE had already obtained the $1.5 million that it advanced per the fax—so the fax did not further the scheme in that sense. But the Supreme Court has held, with respect to the mail-fraud statute, that "[m]ailings

occurring after receipt of the goods obtained by fraud are within the statute if *they*"—meaning the mailings themselves—"were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." *United States v. Lane*, 474 U.S. 438, 451-52 (1986) (emphasis added; internal quotation marks omitted). Our court has extended this rule to the wire-fraud statute. *See United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994).

Here, the jury had sufficient basis to find that the April 19, 2002 Receivables Purchase Report was designed to have a lulling effect upon the Trustees, and thus ultimately upon the investors. *Cf. Lane*, 474 U.S. at 452 n.16 ("Had the Lanes failed to submit timely proof-of-loss forms here, the insurer might very well have discovered the fraud"). That satisfies the second element of wire fraud.

The third is that Faulkenberry intended to deprive a victim of money or property. The evidence overwhelmingly demonstrates that he did. Sufficient proof supported his wire-fraud conviction.

B.

1.

Faulkenberry next challenges the sufficiency of the evidence supporting his four convictions for securities fraud, in violation 15 U.S.C. §§ 77q(a) and 77x. The former provides in relevant part:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
>> (1) to employ any device, scheme, or artifice to defraud, or
>>
>> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 77x makes it a criminal offense to "willfully violate[]" § 77q(a).

Faulkenberry's securities-fraud convictions are based upon four particular bond issuances, which according to the government followed the usual pattern: NCFE executives lied to investors, who then purchased bonds from NPF VI and XII during late 2001 and early 2002. That theory is straightforward; and given the government's proofs of Faulkenberry's involvement in NCFE's fraud generally, one might expect to see here some misrepresentation or other evidence of deception by Faulkenberry specific to these four bond issuances. But one does not see that either. Instead, as the predicate conduct for these convictions, the government cites Faulkenberry's signature on "incumbency certificates" for each of the bond issuances. Those certificates essentially state that the entities issuing the bonds were corporations "duly organized and validly existing under the laws of the State of Ohio," that the officers who signed the bonds had the positions the bonds represented them to have, and that the officers' signatures were genuine. No one contends that the certificates themselves were fraudulent. Thus, the question whether Faulkenberry's signatures on the certificates were themselves a fraudulent device or practice under § 77q(a) is, at the very least, complicated.

But we need not answer that question. The indictment charged Faulkenberry not only with primary violations of the securities-fraud statutes, but also with aiding and abetting such violations—which allows for punishment as a principal. *See* 18 U.S.C. § 2. Faulkenberry's securities-fraud convictions can stand on this ground "if some other party has committed a securities law violation, if the accused party had general awareness that his role was part of an overall activity that is improper, and if the accused aider-abettor knowingly and substantially assisted the violation." *S.E.C. v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974); *see also, e.g.*, *United States v. Dowlin*, 408 F.3d 647, 658-59 (10th Cir. 2005) (upholding a securities-fraud conviction under the aiding-and-abetting statute based on the defendant's "willing and knowing involvement in [the] fraudulent ventures").

All those requirements are met here. First, an NCFE principal committed securities fraud in authorizing the four bond issuances. *See United States v. Ayers*, Case Nos. 08-4166

and 08-4405 (6th Cir. July 28, 2010). Second, for the many reasons already recited, a rational jury could find that Faulkenberry knew that his role in signing the certificates was part of an overall fraudulent scheme. And third, it is undisputed that the bonds could not have been issued—and thus that these four installments of the fraud could not have occurred—absent the signed certificates. Faulkenberry's signatures therefore substantially assisted NCFE's fraudulent scheme. Sufficient evidence supported his securities-fraud convictions.

2.

We digress briefly from Faulkenberry's sufficiency arguments to address an instructional argument specific to his securities-fraud convictions. That argument pertains only to the instructions for the charged primary violations, but is not rendered moot by our determination that sufficient evidence supported Faulkenberry's convictions on aiding-and-abetting grounds. *See Griffin v. United States*, 502 U.S. 46, 59 (1991). The relevant instruction told the jury that it could convict if Faulkenberry "obtained money or property by means of . . . any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" Faulkenberry's argument is that the instructions should have made clear that Faulkenberry must have actually *known* he had a duty to disclose any omitted facts on which a conviction might be based. Faulkenberry did not present this argument to the district court, however, so we review the issue only for plain error. Fed. R. Crim. P. 52(b).

The only circuit court to have addressed the issue has held that "cases addressing [the securities-fraud statutes] have *not* required proof of knowledge of illegality." *United States v. English*, 92 F.3d 909, 915 (9th Cir. 1996) (emphasis added). Faulkenberry's argument, moreover, is far from correct on its face. There was no plain error.

C.

Faulkenberry argues that there was insufficient evidence to support his conviction for conspiracy to commit securities and wire fraud, in violation of 18 U.S.C. § 371. To sustain a conspiracy conviction, the government must "prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the

conspiracy." *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008) (internal quotation marks omitted). "The existence of a conspiracy may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan." *United States v. Deitz*, 577 F.3d 672, 677 (6th Cir. 2009) (internal quotation marks omitted).

For the reasons already explained, there was ample evidence that Faulkenberry and other NCFE executives agreed to commit securities fraud and wire fraud. That satisfies the first element of the offense. As for the second, the government need only prove "that one of the conspirators" committed an overt act. *See United States v. Kraig*, 99 F.3d 1361, 1368 (6th Cir. 1996). Here, the government charged that, on November 20, 2001, Jon Beacham, NCFE's former Director of Securitizations, "promised investors that their monies would be used for the purchase of Eligible Receivables." Beacham admitted to this overt act at trial. A rational jury could credit Beacham's testimony and find that his misrepresentations to investors furthered the conspiracy to commit fraud. Sufficient evidence therefore supported this conviction.

## D.

### 1.

Faulkenberry challenges the proof supporting his conviction for concealment money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). That conviction was based upon a $22 million advance to Scott Medical Group ("Scott") in July 2001. NCFE had earlier obtained the $22 million from investors by means of the misrepresentations described above. As part of the charged transaction, Faulkenberry arranged for Scott to execute a promissory note reciting that funds belonging to an NCFE subsidiary, rather than investor monies in NPF accounts, would be used for the advance. That recital was false; the record includes a handwritten note, dated several days after the advance, which indicates that, "per Roger[,]" investor monies in an NPF XII account were used instead. The record also includes a phony Receivables Purchase Report for the transaction, which induced the Trustee to wire the funds from an NPF XII account to Scott.

So the advance involved a couple of bogus documents and moved $22 million of investor funds from NPF XII to Scott. The question presented is whether that amounts to money laundering under § 1956(a)(1)(B)(i). That subsection provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).

Faulkenberry does not seriously contest—and the government proved—that the Scott advance involved proceeds of wire or securities fraud, and that Faulkenberry knew that fact. Faulkenberry's argument, instead, is that the government did not prove that the advance was "designed in whole or in part . . . to conceal or disguise" the nature or source of the fraudulently obtained $22 million.

The Supreme Court recently interpreted this very language, albeit as part of a neighboring provision, § 1956(a)(2)(B)(i), which criminalizes transportation (as opposed to a transaction) that is designed to conceal the nature, source, or location of illicit funds. In *Cuellar v. United States*, 128 S. Ct. 1994 (2008), the Court observed that the word "designed," as used in this provision, could potentially be understood in two "different sense[s]." *Id.* at 2003. One sense, adopted by the Fifth Circuit in that case, was that design means "structure or arrangement[,]" so that it would be enough to convict if certain "'*aspects* of the transportation . . . were designed to conceal or disguise' the nature and location of the cash." *Id.* (quoting the Fifth Circuit's opinion) (emphasis added). Under this interpretation, any knowing concealment of a listed attribute of the funds would violate the statute even if the concealment was merely incidental to the transportation's purpose.

But the Supreme Court rejected that interpretation, "think[ing] it implausible . . . that Congress intended this meaning of 'design.'" *Id.* at 2004. Instead, the Court thought it "far more likely that Congress intended courts to apply the familiar criminal law concepts of purpose and intent than to focus exclusively on how a defendant 'structured' the

transportation." *Id.* Moreover, the Court reasoned, "when an act is 'designed to' do something, the most natural reading is that it *has that something as its purpose.*" *Id.* at 2003 (emphasis added). Thus, the Court held, as used in § 1956(a)(2)(B)(i), "'design' means purpose or plan; *i.e.*, the *intended aim* of the transportation." *Id.* (emphasis added).

All of this reasoning, in our view, applies to the meaning of "designed" as used in § 1956(a)(1)(B)(i). To prove a violation of that subsection, therefore, it is not enough for the government to prove merely that a transaction had a concealing effect. Nor is it enough that the transaction was *structured* to conceal the nature of illicit funds. Concealment—even deliberate concealment—as mere facilitation of some *other* purpose, is not enough to convict. *See id.* at 2005 (evidence was insufficient to convict where it "suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation, but not necessarily that secrecy was the *purpose* of the transportation") (emphasis in original). What is required, rather, is that concealment be an animating purpose of the transaction. *See id.* at 2003.

That is not to say, of course, that concealment must be the *only* purpose of the transaction; the statute requires only that the transaction be designed "in whole or *in part*" to conceal. 18 U.S.C. § 1956(a)(1)(B) (emphasis added). Moreover, "purpose and structure are often related[,]" *Cuellar*, 128 S. Ct. at 2004; and thus, depending on context, proof that a transaction was structured to conceal a listed attribute of the funds can yield an inference that concealment was a purpose of the transaction. *See id.* at 2004-05. But the ultimate question under the statute is one of purpose, not structure.

So we apply these principles here. Doing so puts the government in a difficult position, since the case was tried prior to Supreme Court's decision in *Cuellar*, when some lawyers and judges obviously thought that proof of structure (rather than purpose) was enough. And the government's arguments in turn put us in a difficult position, since they are largely conclusory, and thus require us to figure out the bases for them. In that task we will only go so far.

The government focuses on two aspects of the Scott advance: The phony Receivables Purchase Report, and the promissory note's false recital that NCFE's own money, rather than investor monies, would fund the transaction. The government argues that

those aspects allowed the jury to infer "that the transaction was designed to conceal the nature and source of the $22 million, by making it appear to the trustees that the funds were the product of legitimate investments, when in fact they were proceeds of fraud obtained from duped investors." Gov't Brief at 33. But that only tells us the transaction was *structured* to conceal the nature of the funds, which is precisely the meaning of "designed" that the Supreme Court rejected in *Cuellar.* What the government must show, instead, is that the concealment was one of the *purposes* that drove Faulkenberry to engage in the transaction in the first place.

Structure, as noted above, can sometimes yield an inference of purpose; and the government tries to extract that inference here. To that end, the government asserts—without explanation—that the phony Report and promissory-note recital "*could not have been* 'employed to facilitate' the transaction." Gov't Br. at 35 (quoting *Cuellar*, 128 S. Ct. at 2005) (emphasis added). The argument seems to be one of elimination: Since the documents were not facilitative and were themselves deceptive, they must be proof that a purpose of the advance was to conceal the fraudulent nature of the $22 million. We have our doubts about that syllogism. But in any event, its major premise—that these documents could not have been employed to facilitate the advance—is hard to fathom with respect to the phony Report. The Trustees would not have wired the funds without it; which means that the Report, plainly and in fact, *did* facilitate this transaction, just as phony Reports facilitated every advance in the course of the fraud. Thus, even taken on its own terms, the government's argument is incorrect as to the Report. It is conceivable, of course, that a document that facilitates a transaction can support an inference to conceal. But the government does not make that argument with respect to the Report, choosing instead to defend the indefensible ground of non-facilitation.

That leaves the false recital in the promissory note. Whether the recital facilitated the advance is hard to say on this record. The government's brief offers nothing on the subject except the conclusion quoted above. We see no basis to reach any conclusion, therefore, based upon the premise that the recital "could not have" facilitated the advance.

At oral argument, however, the government suggested that the false recital ultimately could have caused Scott to wire payments for the advance to an NCFE account that did not

contain investor funds.  Here the trail fades from argument itself, to mere implication from argument; but the implication seems to be that a transaction that moves money from an account that contains investor funds, to one that does not, would attenuate the funds' connection with the antecedent fraud on the investors, thereby concealing the funds' nature. Whatever the merits of that proposition in theory—and setting aside the deficiencies of this argument *qua* argument—the government simply has not proven the proposition here. Nowhere has the government ever explained, to the jury or this court, exactly how the Scott advance would cause the $22 million to land in an NCFE account that does not contain investor funds.  And we will not engage in a paleontological review of the record to construct that explanation.  So we reject this argument.

The government's remaining argument is similar to the preceding one.  It asserts—again without explanation—that the evidence supports a finding that "another purpose" of the advance "was to further the overall concealment scheme by bolstering the pretense that the funds were legitimate investment proceeds."  Gov't Br. at 36.  That begs the question whether there *was* an overall "concealment" scheme within the meaning of the money-laundering statute, as opposed to simply a fraudulent scheme.  And apart from the two documents discussed above, the government "has not pointed to any evidence in the record from which" a concealment scheme "could be inferred[.]" *Cuellar*, 128 S. Ct. at 2005 n.8.  So we reject this argument as well.

The reality is that the government tried these charges pursuant to a theory other than the one it now advances on appeal.  For that we can hardly blame the government, given the intervening fact of *Cuellar*.  But we are left with a record out of alignment with the law.  In opposing the defendants' motion for acquittal in the district court, the government argued that "[o]nce they've lied to investors and they get the money in their hands, that's using it in other ways, you know, for their own benefit or for the benefit of their clients.  That's the thrust of the money laundering allegations in this case[.]"

That thrust is parried here.  Money in motion does not necessarily equal money laundering.  Even viewing the evidence in the light most favorable to the government, there was no basis to find, beyond a reasonable doubt, that an animating purpose of the Scott

advance was to conceal the fraudulent nature or source of the $22 million. We therefore reverse Faulkenberry's money-laundering conviction.

2.

Faulkenberry also challenges the sufficiency of the evidence supporting his conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Under that provision, the government must prove that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006). For the reasons already explained, the Scott advance cannot form the basis of this conviction. The government's brief does not explain why any other transaction can serve as the basis of this conviction either. The government does argue that "given the evidence of Faulkenberry's involvement in concealing NCFE's advances to healthcare providers, the government was not required to prove his knowledge of the other substantive money laundering transactions[.]" Gov't Br. at 51. But that argument again assumes that Faulkenberry agreed to join a money-laundering conspiracy rather than just a fraudulent one. That assumption is not borne out by the proof in this case. We therefore reverse this conviction.

III.

We make shorter work of Faulkenberry's remaining arguments. The first concerns the testimony of prosecution witness Bernard Woolfley, who presented summary evidence regarding the compensation paid to NCFE's executives and the amount of advances wired to certain providers in which NCFE's principals had an ownership interest. Woolfley was not designated as an expert in the case. Faulkenberry's argument is that Woolfley's testimony should have been excluded, because it was based upon specialized knowledge and thus expert in nature. *See* Fed. R. Evid. 702. We review the admission of this testimony for an abuse of discretion. *United States v. Jamieson*, 427 F.3d 394, 409 (6th Cir. 2005).

Lay testimony "results from a process of reasoning familiar in everyday life, whereas an expert's testimony results from a process of reasoning which can be mastered only by specialists in the field." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (internal

quotation marks omitted). Woolfley presented lay testimony here. Although he summarized a large amount of data, that task required only everyday reasoning rather than specialized knowledge. Moreover, Woolfley did not go on to offer any conclusions as to what the data meant: "I have not made any independent determinations as to what is an eligible receivable or what is an ineligible receivable. The extent of my analysis has been to take the data that is in the funding system and summarize it." So we reject this argument.

Faulkenberry also argues that Woolfley's testimony was improper because it was based upon documents not admitted into evidence. A district court may admit summary evidence under Rule 1006, however, without admitting the underlying documents upon which the testimony is based. *See United States v. Bray*, 139 F.3d 1104, 1111 (6th Cir. 1998). Indeed, "the *point* of Rule 1006 is to avoid introducing all the documents." *United States v. Hemphill*, 514 F.3d 1350, 1359 (D.C. Cir. 2008) (emphasis added). So we reject this argument as well.

Faulkenberry next argues that the prosecution violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to produce certain SEC records to him. To establish a *Brady* claim, Faulkenberry must prove that "the Government suppressed evidence, that such evidence was favorable to the defense, and that the suppressed evidence was material." *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007).

The materials at issue here concerned a parallel SEC investigation into NCFE. That investigation resulted in a March 27, 2008, "Cease-and-Desist Order" in which the SEC found that the Trustee banks were negligent in supervising the NPF investor accounts. Faulkenberry asserts that this Order and the documents that underlay it should have been disclosed to him before trial. That argument is patently meritless as to the Order itself, since the SEC did not issue it until 14 days after his conviction. And Faulkenberry has not specifically identified a single underlying document that he thinks should have been, but was not, disclosed to him. We will not dig through the record for that purpose either; and meanwhile the government contends, and the district court found, that the government gave Faulkenberry all of the SEC documents in its possession. Faulkenberry has not met his burden of showing otherwise.

Faulkenberry also argues that the prosecution effected a hat trick of violations—under *Brady*, the Jencks Act (18 U.S.C. § 3500), and the Confrontation Clause of the Sixth Amendment—when it failed to disclose to him some letters that Gibson wrote while she was in prison.  All of those claims fail for the same reason:  Faulkenberry has not shown that the non-disclosure had any significant effect on his trial.  *See generally United States v. Jones*, 399 F.3d 640, 648 (6th Cir. 2005) (under *Brady*, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the outcome would have been different" (internal quotation marks omitted)); *United States v. Susskind*, 4 F.3d 1400, 1406 (6th Cir. 1993) (under the Jencks Act, a defendant is prejudiced only if "the error is one that might reasonably be thought to have had substantial and injurious effect or influence in determining the jury verdict" (internal quotation marks omitted)); *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (under the Confrontation Clause, a defendant must show that, had he been able to cross-examine a witness on an issue, "[a] reasonable jury might have received a significantly different impression of [the witness's] credibility").  Faulkenberry specifically cites only one letter, in which Gibson wrote the following:

> If there was a way to reclaim my assets WITHOUT NULLIFYING, VOIDING OR IN ANY WAY IMPERILING my plea agreement, that would be something to check out.  I have no intention of starting a fight over my current sentence because the alternative is much worse.  I do not want a score or two of indictments to fight which is why I made a deal in the first place.  How can I make you understand that I just want this whole situation behind me so that I can get on with my life?

R. 640, Exh. B at 30 (emphasis in original).

Faulkenberry's theory is that this passage shows that Gibson actually thought she was innocent, which in turn would have allowed him to discredit her testimony at trial.  Suffice it to say that we do not read the letter the same way.  Moreover, as the district court observed, the few sentences that Faulkenberry cites "would have looked painfully slim next to [Gibson's] three days on the stand[] and her admissions about how she participated in the fraud."  His argument is meritless.

Finally, Faulkenberry argues that he was entitled to a mistrial because the government failed to disclose that a defense witness, Jon Bryant, had previously been an FBI

informant.  We review the denial of a motion for mistrial for an abuse of discretion.  *United States v. Martinez*, 430 F.3d 317, 336 (6th Cir. 2005).

Bryant had worked at NCFE (apparently as an independent contractor) as the administrator of its computer system.  After NCFE's bankruptcy, he met with the FBI to discuss his work there.  All the defendants' counsel were aware of that fact, but nonetheless decided jointly to hire Bryant as an expert witness to testify about NCFE's computer system.  The only thing they did not know was the unsurprising fact that the FBI had summarized its interviews of Bryant in so-called FBI-302 reports.  Thereafter, at trial, Bryant testified on direct examination that he was unaware of any false data on NCFE's computer system.  The government impeached that testimony on cross, using the FBI-302 reports.  Two days later, Faulkenberry's counsel moved for a mistrial, asserting that the existence of the reports was "a complete surprise."  Faulkenberry now contends that the government's failure to produce the reports before trial violated both Federal Rule of Criminal Procedure 16(a)(1)(E)(i) and his due-process right to a fundamentally fair trial.

To which there are several responses.  The basic one, as the district court correctly observed, is that defendants' counsel took a calculated risk in hiring a witness who had met with the FBI during its investigation of their clients.  Further, there is no evidence that the government had any knowledge as to whether Bryant had in any way misled defendants' counsel regarding the extent of his discussions with the FBI.  That the government cross-examined Bryant with a document summarizing what he had told the FBI earlier, therefore, did not violate Faulkenberry's right to due process.

Moreover, the Rule 16 argument was not raised below, so we review that issue only for plain error.  Fed. R. Crim. P. 52(b).  There was none, since Rule 16 is not violated when the defense "knew or had reason to know that th[e] evidence existed," *United States v. Robinson*, 272 F. App'x 421, 434 (6th Cir. 2007), and the reports were not clearly "material to preparing the defense."  *See United States v. McCaleb*, 302 F. App'x 410, 415-16 (6th Cir. 2008).  Faulkenberry's arguments concerning the reports are meritless.

IV.

There remains the question of what to do about Faulkenberry's sentence. Based upon his convictions in the district court, the Sentencing Guidelines recommended that Faulkenberry be sentenced to life imprisonment. By that measure he received a light sentence: The district court chose to run his sentences concurrently rather than consecutively, so as a practical matter Faulkenberry was sentenced to only ten years. Moreover, his money-laundering sentences were functionally the operative ones, since those sentences, unlike the others, ran for ten rather than five years. And the money-laundering convictions are the ones we reverse today.

But that does not mean that this court should reduce Faulkenberry's sentence to five years. When considering a multiple-count criminal judgment that produced "interdependent" sentences, we may "vacate all sentences even if only one is reversed on appeal." *United States v. Clements*, 86 F.3d 599, 601 (6th Cir. 1996). We possess this "supervisory power to vacate and remand" even when the parties do not challenge the defendant's sentences. *Id.* at 600-01.

Having reviewed the sentencing transcript, we are convinced that the district court imposed interdependent sentences here. Had the district court known that the money-laundering convictions were invalid, it might have chosen to make some of the other sentences consecutive rather than concurrent. *Cf. id.* at 601 (remanding for resentencing because, absent a firearm conviction vacated on appeal, "the District Court would have had the discretion to increase [the defendant's] drug trafficking offense level for firearm possession"). We therefore exercise our discretion to remand the case to allow the district court to determine, in the first instance, what Faulkenberry's sentence should be in light of our decision.

We reverse Faulkenberry's convictions for money laundering and conspiracy to commit money laundering, affirm the rest, vacate all the sentences, and remand the case for resentencing.