NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0461n.06

Nos. 08-4166 and 08-4405

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Jul 28, 2010**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| DONALD H. AYERS, | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: SUTTON, KETHLEDGE, and WHITE, Circuit Judges.

KETHLEDGE, Circuit Judge. National Century Financial Enterprises (NCFE) defrauded its investors of more than $2.4 billion. The question here is whether Donald Ayers participated in that fraud. A jury concluded that he did, convicting him of securities fraud, conspiracy to commit securities fraud and wire fraud, and conspiracy to commit money laundering. Ayers now appeals, primarily challenging the sufficiency of the evidence supporting each conviction. We reject his arguments on the fraud convictions, but agree that the government did not prove a conspiracy to commit money laundering. We therefore affirm Ayers's fraud convictions, reverse the money-laundering one, and remand the case for resentencing.

I.

The facts surrounding NCFE's collapse are described in greater detail in *United States v. Faulkenberry*, Nos. 08-4233 and 08-4404, ___ F.3d ___ (6th Cir. July 28, 2010), an appeal by one of Ayers's co-defendants. The facts below suffice for Ayers's arguments.

NCFE's business was to purchase, at a discount, the accounts receivable of healthcare providers. These transactions benefitted providers by affording them immediate cash flow; and in theory, they generated profits for NCFE based on the discounted purchase price.

Of course, NCFE itself needed money to purchase the receivables, so it sold bonds to investors. Technically, two of NCFE's subsidiaries, NPF VI and NPF XII, issued the bonds. But NCFE fully controlled those subsidiaries, and NCFE remained responsible for marketing the bonds. Most of that marketing occurred through monthly presentations or through the Private Placement Memorandum (PPM), which was a document sent to investors describing the bonds.

When marketing the bonds, NCFE executives made specific representations about certain investor protections, four of which are relevant here. First, NCFE promised investors that their monies would be used only to purchase "eligible receivables." A receivable was eligible only if it met certain criteria demonstrating a low risk of default. Second, the purchased receivables would serve as collateral for the amounts that NCFE owed its bondholders. Thus, each time NCFE sent investors' monies to a provider, the investors obtained roughly equivalent collateral in the form of purchased receivables.

Third, NCFE told investors that it would maintain reserve accounts equal to 17% of the "outstanding Purchased Receivables." If any of the purchased receivables were not paid, NCFE could then cover itself by withdrawing the unpaid amount from the reserve accounts. And fourth, NCFE established Trustee oversight for the accounts containing investors' funds. The Trustees were responsible for ensuring that the reserve accounts were adequately funded, and for distributing monthly investor reports that NCFE created. NCFE raised billions of dollars from investors.

The record makes clear that those representations were false. NCFE executives repeatedly lied to investors from approximately 1995 until 2002, when NCFE ceased operations. The deception centered on the practice of "advancing." Contrary to what it told investors, NCFE routinely wired funds to healthcare providers without obtaining any receivables, much less eligible ones, in return. These advances—consisting of investor monies—were the equivalent of unsecured loans. Nevertheless, NCFE sent many of the advances to providers on the verge of bankruptcy, sometimes even to providers *in* bankruptcy.

Unsurprisingly, the providers consistently failed to re-pay NCFE; and over time, the advances rendered NCFE's investors increasingly under-collateralized. They did so on a massive scale: by August 2002, eight providers each owed NCFE over $100 million, one of them as much as $600 million, little of which was secured by eligible receivables.

NCFE went to extraordinary lengths to conceal these aspects of its business. Under the governing documents for investor bonds, the Trustees could wire funds to providers only to the extent that NCFE documented that it was obtaining eligible receivables in return. To evade this

limitation, NCFE submitted a phony Receivables Purchase Report to the Trustees for every advance.

NCFE also hid the advances, and the losses caused by them, from investors. Sherry Gibson, NCFE's

"Director of Compliance," testified at trial that the monthly investor reports "would be manipulated

in any way necessary in order to make compliance[.]" Indeed, she testified that every report from

1995 until NCFE's collapse in 2002 was falsified.

NCFE also concealed shortages in NPF VI's and XII's reserve accounts, albeit in a different

way. Each month, the Trustees were obligated to "test" the sufficiency of the accounts' balances.

NCFE arranged for the NPF VI and XII testing to be conducted on different days, however, and then

shifted funds between each account as needed to make each appear to have sufficient funds on its

testing day. That shifting of funds—first to one NPF entity, then back to the other—occurred every

month from approximately 2000 onward, frequently involving sums over $100 million. By 2002,

NCFE would transfer the entire balance from one entity to the other.

Finally, on September 30, 2002, a Trustee refused to shift funds between the accounts. That

refusal triggered a cascade of events that revealed the full extent of NCFE's fraud to its investors.

NCFE declared bankruptcy in November 2002, resulting in investor losses of approximately $2.4

billion.

That NCFE defrauded its investors does not necessarily mean that all of its executives

participated in the fraud. The person before us in this appeal is Donald Ayers. He was one of

NCFE's three original founders, and considered a "principal." While at NCFE, he served as Chief

Operating Officer and as Vice Chairman of the Board of Directors.

After NCFE's collapse, the government indicted Ayers on six counts of securities fraud, one count of conspiracy to commit securities fraud and wire fraud, and one count of conspiracy to commit money laundering. The government tried him with four co-defendants. After a six-week trial, the jury convicted all defendants on all counts. The district court sentenced Ayers to fifteen years' imprisonment: five years on each of the fraud-related counts, and fifteen years on the conspiracy to commit money-laundering count, with all sentences running concurrently. The court also ordered Ayers to pay restitution in the amount of $2.4 billion.

This appeal followed.

II.

Ayers challenges the sufficiency of the evidence supporting each conviction. When reviewing a guilty verdict, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

A.

Ayers first challenges the sufficiency of the evidence supporting his securities-fraud convictions under 15 U.S.C. §§ 77q(a) and 77x. The former provides in relevant part:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> > (1) to employ any device, scheme, or artifice to defraud, or

> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Section 77x makes it a criminal offense to "willfully violate[]" § 77q(a). The parties here focus on subsection (2), which prohibits material misrepresentations.

Each of Ayers's six counts is based on a particular issuance of bonds by NPF VI or NPF XII. The first issuance occurred on June 20, 2001, and the last on May 31, 2002. Ayers does not dispute that the bond issuances constituted offers of securities, or that instruments of interstate commerce were used in connection with the offers. Instead, he argues that the government did not prove that he "willfully and knowingly represented anything false" in connection with the offers. Ayers's Br. at 68. Ayers's argument encompasses three separate issues: whether he made any statements; whether those statements were false; and whether Ayers knew they were false. We address each issue in turn.

First, Ayers made actionable statements when he authorized the bond issuances. It is undisputed that, as a principal, Ayers was responsible for deciding whether and when to issue new bonds. And as a member of the Board of Directors, Ayers signed Resolutions authorizing each of the six charged issuances. Thus, any statements accompanying those issuances are fairly attributable to Ayers. *See generally S.E.C. v. Tambone*, 597 F.3d 436, 444 (1st Cir. 2010) (en banc) (discussing "the expansive language" of § 77q(a)(2), which "cover[s] the 'use' of an untrue statement of material

fact (regardless of who created or composed the statement)"). Here, each bond issuance was accompanied by a PPM, which described the terms of the bonds, including the investor protections discussed above. The statements within the PPMs are attributable to Ayers.

The second question, then, is whether the PPMs contained any material falsehoods. A rational jury could find that they did. Specifically, each PPM stated that the bond issuer—either NPF VI or NPF XII—would "restrict[] its business to the purchase of Eligible Receivables[.]" The practice of advancing was a patent violation of this restriction. A rational jury could find, therefore, that the PPMs contained misrepresentations that were both false and material.

That leaves only the question whether Ayers knew that the PPMs' representations were false. The jury had ample reason to conclude that he did. As an initial matter, Ayers's status as a principal ensured that he knew about the overall fraud. He attended Executive Committee meetings, where the practice of advancing, the problems caused by advancing, and the compliance issues surrounding investor reports were discussed. Sherry Gibson also described Ayers as one of "the eight most knowledgeable people when it came to the practice of advancing money to health care clients without purchasing eligible accounts receivable[.]"

Documentary evidence likewise supported the inference that Ayers was aware of the fraud. In particular, he received a number of documents, some of which brazenly discussed the fraud. One was a memorandum dated February 11, 1999—stamped both "CONFIDENTIAL" and "For Internal Use Only"—that Gibson sent only to the principals. In it, she discussed an upcoming audit:

> I know that the random audit is a necessary requirement for the securitization(s); however, due to our business practices, it takes several weeks of preparation before the audit can be scheduled. The preparation time is not due to gathering copies of reports, obtaining file copies, etc., the delay is due to the necessity of CREATING the backup that matches the investor report.

Gov't Exh. VII-32A (emphasis in original). Gibson went on to note: "Due to advances with no collateral and high volumes of defaulted [receivables]," NCFE has become "UNDERcollateralized in all portfolios and the investor report numbers are adjusted in order to meet the default triggers." *Id.* (emphasis in original).

There were other incriminating documents as well. In March 1999, Ayers received a memorandum discussing NPF VI's noncompliance, and attaching two versions of an investor report—one version labeled "draft," the other "draft with revisions." The former showed NPF VI in default, whereas the latter showed it fully compliant. Yet another memorandum from Gibson, this one covered in "Confidential" stamps, discussed problems with the reserves: "NPF VI is $45,000,000 SHORT in reserves. . . . We are unable to move monies between books to 'fix' this problem." Gibson ends the memo by stating: "We are creative with month end and the investor reports – but this is beyond our capability to create. This is a crisis – we need help!"

There was also evidence of Ayers's direct participation in the fraud. First, Ayers participated in the decision to conceal the reserve accounts' shortages by shifting funds between them. Second, in preparation for a year-end audit, Ayers helped "reconcile" data that revealed certain clients had been funded beyond their collateral. Third, Gibson testified that the principals decided to issue new bonds whenever they needed to conceal account shortages: "The status of the portfolio, particularly

when the reserves were short, meant that we could not meet compliance tests, meant that we did not

have cash available for new purchases, so that would be a deciding factor in whether new notes

would be required."   And fourth, Ayers personally authorized advances to providers, totaling

millions of dollars.

This evidence speaks for itself.  A rational jury could conclude that Ayers knew about the

fraud that surrounded him.  And based on that knowledge, he also knew that each of the six bond

issuances contained material misrepresentations.  Sufficient evidence supported his securities-fraud

convictions.

B.

Ayers next challenges his conviction of conspiracy to commit securities fraud and wire fraud,

in violation of 18 U.S.C. § 371.  To obtain a conviction under that statute, the government must

"prove an agreement between two or more persons to act together in committing an offense, and an

overt act in furtherance of the conspiracy."  *United States v. Hunt*, 521 F.3d 636, 647 (6th Cir. 2008)

(internal quotation marks omitted).

Here, Ayers concedes—and the government proved—that there was a conspiracy.  But he

argues that he was not a member of it.  To be found a member of a conspiracy, "[t]he defendant need

only know of the conspiracy, associate himself with it and knowingly contribute his efforts in its

furtherance."  *United States v. Beverly*, 369 F.3d 516, 532 (6th Cir. 2004) (internal quotation marks

omitted).

The evidence recited above establishes all of those elements here. Ayers knew about the overall fraud and indeed participated in it by authorizing the bond issuances on which it was based. Sufficient evidence supported Ayers's conviction for conspiracy to commit securities fraud and wire fraud.

## C.

Ayers's final sufficiency challenge is to his conviction of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). To sustain a conviction under that provision, the government must prove that the defendant "agreed with another person to violate the substantive provisions of the money-laundering statute during the period alleged in the indictment." *United States v. Hynes*, 467 F.3d 951, 964 (6th Cir. 2006). Here, the indictment alleged that Ayers conspired to violate the concealment provision of the money-laundering statute, which states:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine . . . or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).

Ayers's primary argument is that, even assuming he conspired to conduct certain transactions, none of them were "designed to conceal" as the statute requires. Ayers did not raise this argument in his opening brief, so we would normally decline to review it. But in the companion case to this one, *United States v. Faulkenberry*, Nos. 08-4233 and 08-4404, ___ F.3d ___ (July 28, 2010), the

defendant squarely raised the "designed to conceal" argument. That case was briefed simultaneously with this one, argued on the same day as this one, and arose from the same underlying fraud. At oral argument in Ayers's case, the panel gave government counsel (the same counsel in both cases) an opportunity to address our concerns about this issue. Whether we think about the point as a matter of plain error or as simply identifying the relevant legal issues in an appeal dealing with the meaning of a statute, it is well within our discretion to apply the published binding precedent in *Faulkenberry* to a companion case that arose from the same underlying fraud, that was argued on the same day, and that is being decided on the same day.

The Supreme Court recently interpreted the money-laundering statute, holding that the word "designed" requires proof of a purpose. *See Cuellar v. United States*, 128 S. Ct. 1994, 2003 (2008) ("[W]hen an act is 'designed to' do something, the most natural reading is that it has that something as its purpose"). Thus, for a transaction to violate § 1956(a)(1)(B)(i), the government must prove that concealment was an animating purpose for entering into the transaction.

The government points to two sets of transactions as proof that Ayers conspired to launder money. First, the government relies on the advances that Ayers personally authorized. The government's theory is that the advances constituted money laundering, that Ayers authorized the advances, and therefore that Ayers conspired to commit money laundering. So this theory is predicated on the premise that the advances constituted money laundering. To support that proposition, the government relies on the phony Receivables Purchase Reports that Ayers submitted

with each advance. Those Reports, the government says (without much explanation), prove that the advances were designed to conceal the fraudulent nature of the funds.

We rejected the same argument in Faulkenberry's appeal, and do so again here. The government is correct that the Receivables Purchase Reports involved concealment: They falsely represented that investors' funds were being legitimately used, and thereby induced the Trustees to wire the funds to providers. But that explains only *how*, and not *why*, the money was moved. The proposition that Ayers authorized the advances for the purpose of submitting phony Reports is simply implausible on this record. The government proved only that the Reports *facilitated* the advances; it did not prove that the Reports, or concealment generally, were the transactions' purpose. *See Cuellar*, 128 S. Ct. at 2005 ("The evidence suggested that the secretive aspects of the transportation were employed to *facilitate* the transportation, but not necessarily that secrecy was the *purpose* of the transportation" (internal citations omitted, emphasis in original)). Ayers's conviction for conspiracy to commit money laundering, therefore, cannot be upheld based on the advances that he authorized.

But the government also seeks to uphold that conviction based upon a second set of transactions; namely, those underlying Counts 18-23 of the Indictment. The Indictment alleges that two of Ayers's co-defendants committed money laundering by "improperly divert[ing] investor funds" to satisfy the debts of a provider in which Ayers had an ownership interest. The government's theory as to Ayers's liability is the same: These transactions constituted money laundering, and Ayers's role in them is evidence of his agreement to launder money.

-12-

But this theory fails for a more basic reason: We have identified no evidence that Ayers was even *aware* of these transactions. On this record at least, transactions of which Ayers was not even aware are not proof that he formed an agreement to launder money. Thus, even assuming that the transactions constituted money laundering, there is no proof that Ayers conspired to that end.

We see no evidence that would support a finding, beyond a reasonable doubt, that Ayers conspired to launder money. We therefore reverse Ayers's conviction for conspiracy to commit money laundering.

### III.

Ayers raises a number of other arguments: he challenges the admission of summary-witness testimony; he alleges that the prosecution withheld exculpatory evidence; and he argues that the government should have disclosed that one of his own expert witnesses had previously been a confidential informant. We rejected these same arguments in Faulkenberry's appeal, *see United States v. Faulkenberry*, Nos. 08-4233 and 08-4404, ___ F.3d ___ (6th Cir. July 28, 2010), and for the same reasons do so here.

### IV.

There remains the question of what to do about Ayers's sentence. Based upon his convictions in the district court, the Sentencing Guidelines recommended that Ayers receive a life sentence. In that respect, Ayers received a light sentence, since the district court sentenced him to only a fifteen-year sentence. Moreover, as a practical matter, Ayers's sentence is based solely on his money-laundering conviction: His seven other convictions each resulted in a five-year sentence, all

of which ran concurrently. And the money-laundering conviction is the one that we reverse today.

But that does not mean that this court should reduce Ayers's sentence to five years. As we explained in Faulkenberry's appeal, had the district court known that the money-laundering conviction was invalid, it might have chosen to make some of Ayers's other sentences run consecutively, rather than concurrently. We therefore remand the case to allow the district court to determine, in the first instance, what Ayers's sentence should be in light of our decision.

We reverse Ayers's conviction of conspiracy to commit money laundering, affirm the rest, vacate all the sentences, and remand the case for resentencing.