NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0168n.06

Nos. 14-3870 and 14-3871

**FILED**
Mar 23, 2016
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| KENNETH T. EMBRY and DEON D. LEVY, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendants-Appellants. | ) | |
| | ) | |
| | ) | |

BEFORE:     BATCHELDER, MOORE, and ROGERS, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Sometime in 2007, Deon Levy decided to move his commercial development business, Ameribuild, from Cleveland, Ohio, to Charlotte, North Carolina. In order to fund the transition, he and a handful of others devised and executed a mortgage fraud scheme. The scheme worked as follows. The conspirators arranged to purchase a house in Charlotte using a home loan. In addition to paying for the house itself, the loan agreement included $350,000 for home improvements. The escrow company wired these funds from North Carolina to Ohio, into an account held by Wolfco, a company owned by co-conspirator Kenneth Embry, which had provided the lender with an invoice for the work to be done on the house. Wolfco did not do any improvements, however. Instead, it distributed the funds to Levy, Embry, and others. Mortgage payments ceased soon after closing, and the bank that owned the mortgage foreclosed on the home, incurring a loss of $539,348.

A federal grand jury indicted Embry, Levy, and Camille Harris (the home's titular owner) for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. After a trial, a jury found Defendants guilty of all counts. All three timely appealed, and we consolidated their cases. However, we recently determined that Harris, who had been representing herself on appeal, is entitled to court-appointed counsel. We therefore severed her appeal and granted her leave to begin it anew. Today's decision thus concerns only Embry and Levy.

## I. Factual Background

Levy's first step in arranging the fraud was contacting a Charlotte-area real estate broker named Somer Bey who specialized in "equity payout" deals. The two settled on a new construction at 1920 Smarty Jones Lane in Waxhaw, North Carolina. When discussions turned to financing, Levy told Bey that he owed a lot of money to the IRS and that the title and mortgage loan would need to be placed in Harris's name. Harris, Levy said, was the president of Ameribuild.

Levy submitted fraudulent loan documents on Harris's behalf, stating that Harris had a much higher income and net worth than she in fact did. This allowed Levy and Bey to secure a $1,162,500 loan in Harris's name through Fairway Independent Mortgage Corporation (the mortgage company).

Prior to closing, Bey received an invoice from Wolfco for $340,000, purportedly for improvement work to be done on the Smarty Jones property. Bey sent the invoice to the Gary Wood, the property's erstwhile owner (who was aware of the fraud), for approval before sending it to the closing attorney.

The loan closing documents were signed and notarized, and they bore Harris's name and signature. The loan application stated (falsely) that Harris would be paying the down payment from her checking and savings accounts; in fact these expenses were paid by an outside investor who was not aware of the scheme.

The investor wired a down payment of $155,089 to the escrow company, American Home Closings, in Charlotte, North Carolina. Two days later, the escrow company made a wire transfer of $340,000 from Charlotte, North Carolina, to an account in the name of "Wolfco dba Kenneth T. Embry" in Woodmere, Ohio.

Wolfco then issued a $181,000 check to "cash," and Embry then sent a $180,000 cashier's check to the investor. Embry's name appeared on the cashier's check under the heading "remitter." Wolfco also transferred $150,000 to Ameribuild and issued two checks for $2,500, which Embry cashed for himself. Ameribuild then issued a check for $80,000 to Harris, which she deposited into her personal account on January 9, 2008. Harris also signed a check payable to Bey for $3,000.

Levy then moved into the Smarty Jones house and lived there until the latter part of 2008. The loan money did not go to any renovations except for $1,500 for flooring repairs. Soon thereafter, the house entered foreclosure. And the bank that owned the mortgage lost $539,348.63.

**II. Procedural Background**

Inquiry into the scheme began in August 2008, when the Fraud Division of the Ohio Department of Insurance came across evidence of the fraud while investigating an unrelated fire insurance claim Harris had filed in connection with a residence she owned in Cleveland. The state agency issued an administrative subpoena to Microsoft for the contents of Levy's email

account on June 17, 2009. And on July 16, 2009, it issued a subpoena to Google for the contents of Embry's email account. Among the subpoenaed emails was a copy of the Wolfco invoice.

A federal grand jury eventually returned an indictment charging Levy, Harris, and Embry with Conspiracy to Commit Wire Fraud (Count I), Wire Fraud (Count II), and Conspiracy to Commit Money Laundering (Count III). The indictment alleged that Defendants had made false representations to Fairway, the lender, relating to the Smarty Jones property and that Defendants had extracted funds from the loan proceeds through a fictitious invoice. The "manner and means" sections of the indictment were based in large part on the email communications subpoenaed by the Ohio officials.

Embry and Levy filed a joint pretrial motion to suppress "all evidence derived from and/or related to" the emails the government had obtained pursuant to administrative subpoenas to Google (Embry's account) and Microsoft (Levy's account) and a search warrant for Levy's emails. The district court granted the motion.

Two days after this ruling, and some five months before trial, the government filed a supplemental trial brief, which sought, among other things, to get some of the excluded email correspondence into court under the independent source exception. The brief explained that Bey, the government's key witness, had forwarded email correspondence from Levy and Embry to the mortgage corporation and that this correspondence was lawfully obtained via a June 4, 2009 administrative subpoena of the mortgage company's records. According to the brief, this subpoena predated the Google and Microsoft subpoenas. No one objected on suppression grounds.

Three days before trial, the government filed an exhibit index, which included the Wolfco Invoice. Defendants did not object to the list and did not object on suppression grounds during

the trial when the invoice was admitted through the CEO of the escrow company. The jury, a few members of which had trouble staying awake during the trial, convicted Defendants on all counts. After trial, Defendants filed a joint Rule 29 Motion for Judgment of Acquittal and Rule 33 Motion for a New Trial. The district court denied both motions.

### III. Analysis

On appeal, Embry and Levy contend that the district court erred in denying their Motion for a Judgment of Acquittal and that it committed plain error in admitting the Wolfco invoice and in redacting portions of the indictment. Embry also argues that the district court committed reversible error in not dismissing the sleeping jurors, in denying his eleventh-hour request for new counsel, and in calculating the loss amount at sentencing. Levy contends that he was denied effective assistance of counsel. We consider each argument in turn.

### A. Motion for Judgment of Acquittal

This court reviews *de novo* a district court's denial of a Rule 29 motion for judgment of acquittal based on the insufficiency of the evidence. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). "The Court must construe the evidence in the light most favorable to the government, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* Defendants "bear a very heavy burden" in challenging the sufficiency of the evidence. *Id.*

*Wire Fraud.* Embry contends that the government failed to prove that he committed wire fraud because there was no evidence that he used or caused to be used an interstate wire communication "in furtherance of the scheme." *United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010); *see also* 18 U.S.C § 1343. This argument is not well taken. All the government must prove is that the defendant did some act with knowledge that the use of the

wires would follow in the ordinary course of business or that such use, though not actually intended, was reasonably foreseeable. *United States v. Calandrella*, 605 F.2d 236, 253 (6th Cir. 1979). We live in the age of electronic banking, and it was reasonably foreseeable that the wires would be used to send money across state lines given the geographic distance between the North Carolina lender and Embry's Wolfco bank account in Ohio. And while Embry is correct that the Wolfco invoice listed a North Carolina address, it is equally true that Wolfco used an Ohio bank account. It was reasonably foreseeable that the payment would be made directly to that account, and his argument thus fails.

Levy contends for his part that the government never proved that he had any involvement with the wire fraud conspiracy, noting that there is not a single instance in the record of his using the interstate wires with intent to deprive an entity involved in this case of money or property. He argues that nothing aside from Bey's testimony, secured via a plea deal, ties Levy to Ameribuild and that the government contended that he was "Director of Operations for [Ameribuild]," without ever introducing any evidence that he in fact held such a position.

These arguments are meritless. As mentioned, there is no requirement that the defendant *himself* use the wires so long as their use was reasonably foreseeable. According to Bey, whose credibility we may not question on appeal, Levy was in on the entire deal: he wanted to buy a house where he "could pull the money out of the property" to use for Ameribuild. He knew "how the deal needed to be structured" in order to do so. And it was Levy who provided the documentation for the loan's approval, which Harris signed. A crucial part of Levy's scheme was the use of the Wolfco invoice to get the funds from the lender. And while it does appear that the government never proved that Levy was the "Director" of Ameribuild, the title is of little importance. What matters is that, as Bey testified, the company belonged to Levy.

*Conspiracy to Commit Money Laundering*. Embry and Levy have a better argument with respect to money laundering. This is because the money laundering statute is a concealment statute, not a spending statute. *United States v. Warshak*, 631 F.3d 266, 321 (6th Cir. 2010); 18 U.S.C. § 1956(a). Proving a violation requires more than showing that some transaction had a concealing effect or "that the transaction was structured to conceal the nature of illicit funds." *Faulkenberry*, 614 F.3d at 586 (emphasis omitted). "Concealment—even deliberate concealment—as mere facilitation of some other purpose [e.g., fraud], is not enough . . . . What is required, rather, is that concealment be an animating purpose of the transaction." *Id.* (emphasis omitted).

The deception involving the "Wolfco dba Kenneth T. Embry" account thus falls short of proving conspiracy to commit money laundering. The purpose of that deception was to conceal from the lender that the money would be paid to those participating in the fraud rather than to fund work on the house. It was not a ploy to disguise the nature, location, source, ownership, or control of the proceeds—indeed, Embry's name was on the account. *See United States v. McGahee*, 257 F.3d 520, 528 (6th Cir. 2001); *United States v. Blankenship*, 382 F.3d 1110, 1128-31 (11th Cir. 2004) (setting up a "dba" bank account to be able to liquefy fraudulently obtained funds is not covered by the wire fraud statute).

The subsequent transactions disbursing the funds were not designed to conceal either. *See Faulkenberry*, 614 F.3d at 586; 18 U.S.C. § 1956(a). Nor was the disbursement plan complex enough that "a reasonable juror [could] infer that the transactions were made for the purpose of concealment." *Warshak*, 631 F.3d at 321. As the district court concluded at sentencing, this scheme was not "a multi-tiered conspiracy."

Neither the individual transactions disbursing the fraudulently obtained funds nor the disbursement plan as a whole was designed to conceal the nature, location, source, ownership, or control of the funds. The convictions for conspiracy to commit money laundering hence cannot stand.

### B. The Wolfco Invoice

As mentioned above, Embry and Levy successfully moved to suppress all evidence stemming from or related to the illegal searches of their email accounts, including the copy of the Wolfco invoice discovered therein. At trial, the government nevertheless introduced the Wolfco invoice through the testimony of the escrow company's CEO.

The core of Embry and Levy's argument is that the invoice and related testimony were in fact suppressed by the district court and that the government misled the district court and Defendants about the independent source of the invoice introduced at trial. This invoice was, according to Defendants, the fruit of a poisonous tree, discovered as a result of the illegal search of the email accounts.

Because there was no objection at trial, we review this evidentiary decision for plain error. *United States v. Marrero*, 651 F.3d 453, 470 (6th Cir. 2011). To show plain error, Defendants must demonstrate that the error was clear or obvious; that it affected their substantial rights; and that it seriously affected the fairness, integrity, or public reputation of the judicial proceedings. *Id.*

Embry and Levy have failed to show any obvious error. The record reveals that the copy of the invoice admitted at trial could have been admitted under the independent source exception or the inevitable discovery doctrine. Bey testified that she had received a copy of the invoice

from Embry and then forwarded it to Gary Wood. It was then submitted to the closing attorney. And a copy of the invoice eventually found its way into the possession of the escrow company.

A subpoena of the mortgage company's records, which was issued *before* the illegal subpoenas of the email accounts, resulted in the discovery of documents identifying the escrow agent. These documents also contained the names of Robert Mahaney, a mortgage broker who received a kickback for helping Levy and Bey with the fraudulent loan application, and Gary Wood, the original owner of the Smarty Jones property, who was also in on the fraud.

It is not obvious error to think that these clues would have eventually led to the escrow agent and, from thence, to the invoice. Moreover, the email was also discovered in the course of a separate, parallel investigation of the Smarty Jones property. "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." *Murray v. United States*, 487 U.S. 533, 542 (1988).

### C. Redaction of the Indictment

Felony prosecution must begin with an indictment, and a defendant can be convicted only of crimes for which he was indicted. *See United States v. Weinstock*, 153 F.3d 272, 278 (6th Cir. 1998). But alterations of an indictment are problematic only when they either "modify essential elements of the offense charged such that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged" or when a change "affect[s] a substantial right of the defendant." *United States v. Kuehne*, 547 F.3d 667, 683 (6th Cir. 2008).

Defendants have not shown either. The indictment's redacted paragraphs were simply other factual allegations that could have triggered the jurisdictional requirement of the wire fraud statute, i.e., that the Defendants caused an interstate wire transfer to occur. Removal of these

paragraphs did not alter the elements of the crime—it merely narrowed the indictment, which is permissible. *See United States v. Miller*, 471 U.S. 130, 136 (1985).

### D. Sleeping Jurors

According to the record, more than one juror fell asleep on at least four occasions: First, during the direct examination of Michelle Minich, a government witness. Second, during the defense's cross-examination of FBI Agent McGovern, a government witness. Third, during Levy's closing argument. And fourth, during the government's closing argument. Embry contends that he should get a new trial as a result. We disagree.

Sleeping jurors obviously cannot be expected to perform their duties fairly and impartially. *United States v. Warner*, 690 F.2d 545, 555 (6th Cir. 1982). But automatic dismissal is not the rule, and we afford district courts considerable discretion in handling sleeping jurors—"overturning the verdict is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury." *United States v. Cook*, 550 F. App'x 265, 270 (6th Cir. 2014) (internal quotation marks omitted) (unpublished).

This is a high bar, and we cannot say that the sleeping in this case meets it. Following a colloquy with the defense attorneys regarding whether a sleeping juror should be dismissed, the district court declined to dismiss the sleeping jurors because Harris's attorney did not agree to the dismissal. Because the district court's colloquy with counsel was not transcribed, we do not know the content of the request from Harris's counsel for the jurors to remain, or if remaining defense counsel eventually agreed. Significantly, defense counsel did not raise any objections at trial, despite the jurors falling asleep during closing arguments. *See United States v. Wheaton*, 517 F.3d 350, 361 (6th Cir. 2008) ("Notably, Wheaton's attorney did not object in any way to

the district court's treatment of the juror misconduct, which suggests that the misconduct was not perceived to be a serious concern at the time."). Under these circumstances, it was not an abuse of discretion for the district court to retain the jurors, despite the troublesome level of sleeping that appears in the record.

### E. Embry's Eleventh-Hour Request for Substitute Counsel

Embry sent the district court two letters just prior to trial, explaining that he was dissatisfied with his lawyer. When a criminal defendant asks for appointment of a new attorney, the district court must conduct an adequate inquiry into the reasons for the defendant's dissatisfaction. *United States v. Jennings*, 945 F.2d 129, 132 (6th Cir. 1991).

Embry contends that the district court failed to conduct an adequate inquiry and that he should have been appointed a new attorney. We review "a district court's decision regarding an indigent defendant's motion for substitute counsel under the abuse-of-discretion standard." *United States v. Vasquez*, 560 F.3d 461, 466 (6th Cir. 2009). The following factors inform our analysis: (1) the timeliness of the motion, (2) the adequacy of the court's inquiry, (3) the extent of the attorney-client conflict and "whether it was so great that it resulted in a total lack of communication preventing an adequate defense," and "(4) the balancing of these factors with the public's interest in the prompt and efficient administration of justice." *Id.*

With respect to the first factor, Embry argues that he wrote as soon as he knew that his attorney was unprepared. This seems likely enough, but it is equally true that the letters came less than a week before trial and that "the granting of the defendant's request would almost certainly [have] necessitate[d] a last-minute continuance." *United States v. Whitfield*, 259 F. App'x 830, 834 (6th Cir. 2008) (unpublished) (per curiam). In such situations, we have said that "the trial judge's actions are entitled to extraordinary deference." *Id.*

Embry next contends that the judge did not provide an adequate on-the-record inquiry, but rather relied on two *ex parte* conversations between her judicial assistant and defense counsel. Embry points out that the on-the-record discussion regarding his request happened immediately before the prospective jurors were brought into the courtroom, and he argues that the way the district court handled the matter left no doubt from the start that no additional information would change the court's mind.

"[T]o meet th[e] [second] requirement, the district court simply must allow a defendant the opportunity to explain the attorney-client conflict as he perceives it." *United States v. Marrero*, 651 F.3d 453, 465 (6th Cir. 2011). While the discussion could have been more thorough, the district court did allow Embry to speak every time he asked for permission to do so and allowed him to describe the conflict as he saw it. The court also told Embry that he could represent himself.

With respect to the third factor, Embry points out that the on-the-record colloquy centered on whether Embry's attorney was prepared for trial, not on the state of the attorney-client relationship. However, the transcript does show that Embry and his attorney were, in fact, communicating.

The fourth factor—the public's interest in the prompt and efficient administration of justice—weighs decidedly in the district court's favor. Delaying the trial just days before it was set to begin would have been costly and inconvenient, and it would have further delayed justice in a case that had been pending since 2012 and dealt with facts from 2007–08. Moreover, this

was not the first time Embry had become dissatisfied with his attorney.[1]  We therefore conclude

that the district court did not abuse its discretion in denying Embry's request.

## F. Loss Calculation

Embry argues that the district court's loss calculation violated his Fifth and Sixth

Amendment rights.  As he acknowledges, this court rejected this argument in *United States v.*

*Smith*, 749 F.3d 465, 487 (6th Cir. 2014).  We are bound by *Smith* and therefore affirm the

district court's loss calculation.

## G. Ineffective Assistance of Counsel

Levy argues that he was denied effective assistance of counsel at trial.  Federal habeas

corpus review is "the preferred mode for raising a claim of ineffective assistance of counsel."

*United States v. Ferguson*, 669 F.3d 756, 762 (6th Cir. 2012).  Though this court "may choose to

hear the issue on direct appeal if we find that the parties have adequately developed the record,"

we see no reason to do so here.  *Id.*

## IV. Conclusion

We find no merit in Defendants' claim that the cumulative weight of the errors in this

case independently warrants reversal.  For the reasons discussed, we reverse the district court's

decision that the government failed to prove that Defendants were guilty of conspiracy to commit

money laundering and remand for resentencing.  We affirm in all other respects.

---

[1] Embry's attorney at this stage was not court appointed. Embry had originally asked for a court-appointed attorney and received one.  After he became dissatisfied with that attorney, he hired his own.  This caused the court to continue the final pretrial conference and the trial.