NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0432n.06

No. 14-3880

**FILED**
Jul 28, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| | ) | |
| | ) | |
| CAMILLE HARRIS, | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: BATCHELDER, MOORE, and ROGERS, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Sometime in 2007, Deon Levy decided to move his commercial development business, Ameribuild, from Cleveland, Ohio, to Charlotte, North Carolina. In order to fund the transition, he and a handful of others devised and executed a mortgage fraud scheme. The scheme worked as follows. The conspirators arranged to purchase a house in a Charlotte suburb using a home loan. In addition to funding the purchase price of the house itself, the loan agreement included $350,000 for home improvements. The escrow company wired these funds from North Carolina to Ohio, into an account held by Wolfco, a company owned by co-conspirator Kenneth Embry, which had provided the lender with an invoice for the work to be done on the house. Wolfco did not do any improvements, however. Instead, it distributed the funds to Levy, Embry, and others, including Camille Harris, the

Charlotte-area home's titular owner. Mortgage payments ceased soon after closing, and the bank that owned the mortgage foreclosed on the home, incurring a loss of $539,348.

A federal grand jury indicted Embry, Levy, and Harris for conspiracy to commit wire fraud, wire fraud, and conspiracy to commit money laundering. The consolidated case proceeded to trial, but only after the court had granted two continuances. Just a few days before trial was set to begin, Harris asked that the district court grant a third continuance because a key expert witness for her defense—a handwriting expert who was expected to testify that the loan documents bearing Harris's name had likely not been signed by her—had very recently had shoulder surgery and could not testify for twelve weeks. The government opposed the motion, proposing instead that the court allow the expert to testify via teleconference or, alternatively, that the government would stipulate to the admissibility of the expert's report.

The district court denied Harris's motion, concluding that it was "inconceivable that defense counsel ha[d] had no conversations with the expert witness who was expected to testify in two business days," and that the government's proposed alternatives were "acceptable to this Court." [R. 96 at 1059]. Before jury selection, moreover, the district court gave Harris the option of having someone drive the expert to court, explaining that it was willing to hold two short recesses in the trial so that, if necessary, her attorney could pick the expert up and drive her to court and, after she had testified, could take her back home. Harris declined this option and instead presented the expert's report as evidence at trial.

At trial, one of the government's key witnesses, the real estate agent who facilitated the fraud, Somer Bey, testified that Levy had told her that the home could not be purchased in his name because of his outstanding tax debts to the IRS. Instead, Bey explained that Levy had proposed that the home purchase be in the name of Harris, who, according to Levy, was

Ameribuild's president. The loan application bearing Harris's name included many false statements, indicating that Harris had a much higher income and net worth than she in fact did. The closing documents also bore Harris's name and multiple signatures. Those documents were also notarized. The notary testified at trial that she always obtains the driver's license of the person signing the documents to confirm the person's identity and that she compares the photograph on the license to the appearance of the person. [R. 207 at 2672-73]. She also testified that the person who signed the documents identified herself as Camille Harris, that her driver's license said Camille Harris, and that she signed the documents as Camille Harris. [*Id.* at 2679–80]. Harris's daughters, however, testified that they had been with their mother on the day in question preparing for a family party in Cleveland, and that they had not seen a notary come to the house at any point in the day. [R. 208 at 2810-17, 2819-25].

The jury found the defendants guilty of all counts. In a motion for a new trial, Harris claimed that the refusal to grant a continuance prejudiced her because it prevented her from calling the handwriting expert to the stand, and that, as a direct result, she herself decided not to testify on her own behalf. The district court denied the motion. The court eventually sentenced her to 46 months' imprisonment, which was at the very bottom of the guidelines range.

All three defendants timely appealed. And while we initially consolidated their cases, we later severed Harris's appeal so that she could be represented by counsel rather than proceed *pro se* after her retained lawyer failed to file a brief. While Harris's appeal was being briefed, we issued an opinion deciding Embry and Levy's appeals, concluding that the district court had erred in ruling that the evidence at trial was sufficient to sustain Embry and Levy's convictions for conspiracy to commit money laundering, but affirming the district court on all other assignments of error raised in their appeals.

Harris's appeal is now fully briefed and ripe for decision. She marshals four arguments on appeal: (1) that she was denied the right to present a full defense because the district court denied her request for a continuance so that her expert witness could recover from surgery, (2) that the court denied her the right to confront a key government witness against her, FBI Agent McGovern, (3) that the government failed to present sufficient evidence to convict Harris of any of the charged offenses, and (4) that the district court failed to give an adequate explanation of its sentence, which was thus procedurally unreasonable. We consider each in turn.

*Full Defense.* The Constitution guarantees accused persons the right to make a full defense at trial, but "[t]he denial of a defendant's motion for a continuance amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *United States v. King*, 127 F.3d 483, 486–87 (6th Cir. 1997) (internal quotation marks omitted). Further, in order to prevail on appeal, a defendant must also show that the denial resulted "in actual prejudice to [her] defense," *i.e.*, that "a continuance would have made relevant witnesses available or added something to the defense." *Id.* (internal quotation marks omitted).

The district court's decision in this case to deny the continuance is neither unreasoned nor arbitrary. The trial had been continued twice already, and Harris's motion came at a very late hour, after the final pretrial conference and only a few days before trial was set to begin. Of course, Harris has a point in saying that these reasons should not trump her ability to call a key witness, but she cannot show actual prejudice in light of the district court's proposed alternatives of having the witness testify telephonically or be driven to the courthouse. Harris notes that the witness was immobile and heavily medicated, suggesting, it seems, that she would have been unable to testify regardless of what kinds of accommodations were made. But this is not borne

out by the record:  the underlying letter from the expert explaining her predicament reveals that the immobility referred to was her inability to move her arm and the doctor's orders that she refrain from driving.  And while the expert did say that her pain medication made her sleepy, Harris does not point to anything suggesting that this drowsiness was so severe that it would have impeded the expert from providing cogent testimony.  Further, by allowing the expert's report to be admitted, the core of what she would have testified about was presented to the jury, and Harris does not point to anything substantive that would have been different had the expert given live testimony.  The decision not to bring in the expert for live testimony was, ultimately, Harris's, as was the decision to not take the stand in her own defense.  There was thus no constitutional violation.

*Confrontation.*  Harris contends that her convictions must be vacated because her attorney was prohibited from pursuing a full cross-examination of  FBI Agent McGovern, one of the government's key witnesses and the agent in charge of the investigation.  Harris notes that on cross-examination her trial attorney sought to impeach Agent McGovern through a series of questions relating to his knowledge of the facts of the case as well as his accounting knowledge (McGovern is a CPA).  For example, Harris's counsel attempted to ask McGovern about whether a person who takes a loan has an obligation to repay it; whether, in his experience as a CPA, McGovern could tell the jury whether banks make money from loans that are repaid in full; whether he believed that Harris had actually signed the loan documents;  and what he made of the government's handwriting expert's analysis.  The government objected to these lines of questioning, and the district court sustained those objections.

Harris argues that, in doing so, the district court denied her Sixth Amendment right to confrontation by preventing her attorney from pursuing questions that sought to elicit relevant

admissible evidence, which would have undercut Agent McGovern's credibility before the jury. She accordingly asks that we remand her case for a new trial.

We disagree. The Constitution guarantees that, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. And Harris is right that this guarantee protects the right of the accused to engage in cross-examination. *See United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014). But, as with almost all rights, the right to cross-examination has its limits. *Id.* "So long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Callahan*, 801 F.3d 606, 624 (6th Cir. 2015) (quoting *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998)). Thus, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

We find no error in the district court's rulings. The questions about repayment obligations were simply irrelevant to whether Harris had committed, or conspired to commit, wire fraud. *See, e.g.*, *United States v. Davis*, 397 F.3d 340, 345 (6th Cir. 2005). And though the authenticity of Harris's signatures was an important aspect of the case, Agent McGovern's personal beliefs about those signatures was irrelevant inasmuch as he was not a handwriting expert, and he had testified that he had read but not entirely understood the report of the FBI handwriting expert. Further, defense counsel was able to elicit sufficient testimony on this issue, including Agent McGovern's admission that his investigation had not uncovered evidence

indicating that Harris had in fact signed the loan documents. This provided the jury with ample evidence—especially since the government's handwriting expert testified at trial and was subject to cross examination—to adequately consider Harris's theory of the case as well as Agent McGovern's motivations and credibility.

*Sufficiency of the Evidence*. Defendants "bear[] a very heavy burden" in challenging the sufficiency of the evidence. *United States v. Clay*, 667 F.3d 689, 693 (6th Cir. 2012). In analyzing a motion for a judgment of acquittal, "The Court must construe the evidence in the light most favorable to the government, and then determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*

As the government concedes, Harris has met this burden with respect to her conviction for conspiracy to commit money laundering. As we explained in addressing Embry and Levy's similar argument in their related appeals, there was no evidence that they, or Harris, had conspired to conceal or "disguise the nature, location, source, ownership, or control of the proceeds" of the fraud. *United States v. Embry*, 2016 WL 1127804, at *4 (6th Cir. Mar. 23, 2016). Harris's conviction of conspiracy to commit money laundering must therefore be reversed.

However, Harris's argument fails with respect to the fraud charges. She points out that the record contains evidence suggesting that she did not in fact sign the mortgage documents, but she ignores the fact that the government presented testimony to the contrary from its handwriting expert and from the notary, who testified that she witnessed Harris sign many of the documents in question. Harris also does not address the evidence that she not only received proceeds from the mortgage fraud scheme, but also passed on kickback money to the complicit real estate agent, Somer Bey.

A reasonable jury could conclude on the basis of this evidence that Harris willfully participated in Embry and Levy's scheme to deprive the lender of money and that the use of the wires in the execution of that scheme was foreseeable, thus satisfying all the elements of wire fraud. *See United States v. Faulkenberry*, 614 F.3d 573, 581 (6th Cir. 2010). Further, a reasonable jury could also infer from this evidence that Harris had the specific intent to engage in the scheme together with Levy and Embry, satisfying the elements of conspiracy to commit wire fraud as well. *See United States v. Hopper*, 436 F. App'x 414, 421 (6th Cir. 2011).

*Procedural Reasonableness.* We reverse Harris's conviction for conspiracy to commit money laundering, affirm the judgment in all other respects, and remand for resentencing. We therefore decline to address the procedural reasonableness of the district court's discussion about mitigating factors in the original sentencing hearing.