NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0056n.06

No. 22-5057

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 26, 2023
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

DALE ALLEN FRALEY,

    Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF KENTUCKY

OPINION

Before: SUTTON, Chief Judge; CLAY and BUSH, Circuit Judges.

**CLAY, Circuit Judge.** Dale Fraley ("Defendant") appeals his judgment of conviction of eleven counts of production, distribution, receipt, and possession of child pornography in violation of 18 U.S.C. §§ 2251(a), 2252(a)(2), 2252(a)(4)(B). For the reasons set forth below, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

### A. Factual Background

In May 2021, Dale Fraley was tried and convicted of eleven counts of production, distribution, receipt, and possession of child pornography. Two of Fraley's victims, A.P. and H.G., were named as the affected minors in the charges for production, distribution, possession, and receipt of child pornography.[1] At trial, the government put forward evidence to support its

---

[1] Fraley had other victims, including J.E., and K.G., who were 18 when some of the pornography depicting them was created. J.E. was a minor when she started talking to Fraley's personas online but was likely 18 when she first went to Fraley's house. K.G. was still in high

allegations that Fraley had engaged in a sophisticated plot to lure teenage girls into sending him sexually explicit videos and images and into engaging in sexual acts with him, by interacting with them through numerous fake online personas.

Fraley's minor victims, A.P. and H.G., testified at trial that Fraley created multiple fake Facebook accounts and communicated with them through those accounts, pretending to be young, good-looking men. The jury also heard from two of Fraley's other victims: K.G., whose videotaped deposition was played for the jury, and J.E., who testified in person.

Fraley's scheme typically started with one of his personas befriending a girl on Facebook and chatting with her daily until the relationship turned romantic. Fraley's personas were named Jackson Jordan, Jarred James, Brian Coker, Frankie Penix, Josephus Flavor, and Jordan James. Some of those personas were friendly, some of those personas engaged in romantic relationships with the girls, and some of those personas were antagonistic and threatened the girls to get them to comply.

Fraley's victims, A.P., H.G., J.E., and K.G., all went to the same high school and knew each other.[2] Each persona would target a particular girl for a romantic relationship. For A.P, that persona was Brian Coker. For H.G., that was Jackson Jordan, and then Jarred James. For K.G., that was Jordan James. For J.E., that was Jarred James. The other personas would also befriend the girls. In some cases, the boyfriend persona himself would ask for sexually explicit images.

_____

school when she began a relationship with a persona but had turned 18 in October 2017 shortly before beginning a relationship with Jordan James (one of Fraley's personas) in November 2017.

[2] The Jackson Jordan persona first reached out to H.G. via Facebook when she was 13 years old in 2015 and began chatting with her over Facebook messenger. A.P. and H.G. were cousins and H.G. introduced A.P. to Brian Coker online. A.P. and K.G. had a class together sophomore year and A.P. introduced K.G. to Jordan James online. A.P. and J.E. knew each other from church, and H.G.—who was online dating Jarred James at the same time as J.E.—had threatened J.E. because they were dating the same persona at the same time.

In other cases, one of the other personas who was not dating a particular girl would direct that girl to send naked pictures to her boyfriend persona. The personas' demands for sexual images would escalate and they also encouraged the girls to go to "Uncle Dale's" house and engage in sex acts with him to gain "sexual experience," and to send Fraley sexual images. (Trial Tr. Day 2, R. 228, Page ID #1811–13, 1839–48, 1857–58; K.G. Dep. Video, ECF No. 26, 18:00-19:00; Trial Tr. Day 3, R. 230, Page ID #2048–49). During those encounters, Fraley took videos or directed the girls to take videos of his sexual activities with them.

Fraley used his personas to blackmail the girls too. One of the blackmailer personas, Josephus Flavor, would pretend that he had hacked the boyfriend personas' computers and obtained naked pictures of the girls. Flavor would threaten to release those images if the girls did not comply with the blackmailers' requests. Josephus Flavor also threatened to call child protective services and file a fraudulent report indicating that A.P.'s father was molesting A.P. and her little sister, and that her mother was addicted to drugs. Jospehus Flavor and Frankie Penix both threatened H.G. that they would cause her to be separated from her family and be put back into foster care.

The blackmailer personas would require the girls to send naked photos, record themselves engaging in sexual acts on their own or with other girls, and to transmit audio and video footage of those acts via Skype to the blackmailer personas. Some of the girls' boyfriend personas served as blackmailers for other girls, and the personas all purported to know each other, and treated Dale Fraley as an uncle.

The personas would also send some girls pictures and screenshots of the other girls engaging in sex acts and require them to move those images among accounts or send those pictures to Fraley or another persona's social media or email accounts. The personas explained that they

needed the girls to move those pictures for them so that Dale would not get in trouble for having lots of pictures of underage girls.

The boyfriend personas forbade the girls they were dating from hearing the voices of the other girls' boyfriend personas. The girls eventually began to suspect that the personas were all the same person since they would not receive texts from their "boyfriend" when another girl was on a call with her boyfriend persona. Some of the girls confirmed their suspicions by listening in on each others' calls and noticing background noises that sounded like noises they had heard at Dale Fraley's house in the past. One of the girls, K.G., had access to Fraley's Facebook account and she went through his search history and found an account under the name of Joey Samons, whose pictures were the same as the pictures used by the Jordan James persona. Eventually, A.P. reached out to Joey Samons, video chatted with him, and confirmed that the pictures used by Jordan James were stolen.

At trial, the government's evidence included: (1) the trial testimony of A.P., H.G., and J.E.; (2) the videotaped deposition of K.G.; (3) the trial testimony of a forensic expert who uncovered images of child pornography that had been deleted from Fraley's computers; (4) the trial testimony of Joey Samons (a real individual whose pictures were used to develop the Jordan James persona but who testified he had never met or heard of Jordan James, Dale Fraley, or any of the girls); and (5) the trial testimony of the FBI agents who investigated Fraley. The government's evidence also included: several computers; photographs, taken during the execution of a search warrant of Fraley's house and belongings, containing child pornography and depicting individuals used to create the boyfriend and blackmailer personas; a video depicting Fraley engaging in sexual activity with J.E.; and Skype conversation transcripts where Fraley threatened and gave explicit directions to the girls.

Fraley's defense at trial was that the personas were real individuals, that the girls created the images and sent them to countless individuals they did not know, and that the girls used the story of being blackmailed as pretext to permit the girls to explore relationships with one another. Fraley's mother, Bonnie Fraley, was expected to testify that Jordan James was a real person. Bonnie Fraley, however, was bitten by a spider several months before trial and suffered complications requiring her to have surgery which left her bedridden and unable to testify. Instead, her expected testimony was entered into the record at trial through a stipulation that indicated that she had met Jordan James, that he was on the Fraley's lease agreement for the apartment, and that she had spoken with K.G. about Jordan James.

### B. Procedural History

On October 3, 2019, Dale Fraley was indicted. His indictment initially contained ten counts of production, receipt, distribution, and possession of child pornography. Trial was set for January 2020, but Fraley filed an unopposed motion to continue for the purposes of obtaining an expert to review the government's electronic evidence. The district court granted this motion, continued the trial without setting a new trial date, and scheduled a status conference for April 13, 2020. In March 2020, due to the COVID-19 pandemic, the district court entered a general order continuing all trials set to begin on or before May 1, 2020. The court thereafter set a new trial date for August 10, 2020.

In late July 2020, weeks before the new trial date, Fraley's counsel moved to withdraw over disagreements with Fraley about the strategy for impeaching witnesses. The district court granted the motion to withdraw and appointed a new attorney to serve as Fraley's counsel. The court reset the trial date for November 9, 2020 to allow Fraley's new counsel adequate time to prepare. Meanwhile, the government returned a superseding indictment that altered the dates listed

for existing charges and added four additional counts for producing and receiving child pornography and obscene materials.[3]

Three weeks prior to the November trial date, Fraley again moved to continue the trial on the basis that his new attorney had not received some of the original discovery provided to the old attorney and because the new attorney needed to locate potential defense witnesses. The government initially opposed this motion, but later conceded and withdrew the objection to the continuance. The district court granted Fraley's motion and set the trial for February 1, 2021. In December 2020, the court issued another general order due to COVID-19 which delayed all trials and afterwards set Fraley's trial for May 10, 2021. In February 2021, the court issued another general order continuing all trials due to COVID-19. In March 2021, the court held a telephonic status conference and scheduled trial to begin on May 24, 2021.

Two weeks before trial, Fraley made his fourth motion to continue the trial date because his mother, Bonnie Fraley, whom he intended to call to testify on his behalf as an exculpatory witness, had experienced a spider bite that left her bedridden and in serious condition. At a motion hearing on May 14, 2021, Fraley's attorney provided the district court with information regarding what Bonnie Fraley would have testified to and the court determined that Fraley's mother "has relevant information to provide to the jury, and it is potentially exculpatory." (Mot. Hr'g Tr., R. 208, Page ID #1024).

The district court acknowledged that Mrs. Fraley was in a "bad spot" but noted that a continuance would prejudice the government and the victims in the case since there were "no real

---

[3] Count 14 of the superseding indictment, for possession of obscene materials in violation of 18 U.S.C. § 1465, was severed from the other counts at Fraley's request and later dismissed on the government's motion after Fraley was convicted of the remaining charges in the superseding indictment.

assurances that [Bonnie Fraley was] going to be available the next time I set it, because based upon the information I have from the physician, . . . it could get worse, not better. . . . because she [could] pass away." (*Id*. at Page ID #1024, 1036). The court recommended that the parties reach an agreement on a stipulation that would be presented to the jury, noting that this would be beneficial to defendant since it "avoids the glare of cross-examination in a way that potentially could be even more favorable than not." (*Id*. at Page ID #1024–28).

Trial proceeded as scheduled on May 24, 2021. Shortly before closing arguments, the district court read the following stipulation to the jury:

> My son, Dale Fraley, lives in a home very close to mine. I have daily contact with him, and most days I visit him in his home. Beginning sometime in 2015 and continuing through May 2018, Jordan James resided in my son's home with my son. I know that he resided there because I personally saw him and spoke with him regularly. He moved out of my son's home approximately one week before K.G. moved in. In fact, he moved out because K was moving in. K.G. knew Jordan James and had many conversations with him. She and I have spoken on numerous occasions about Jordan James. I remember a specific conversation I had with her during a family cookout at our home. She discussed Jordan James with me and told me about conversations he had relayed to her about H.G. She told me that she intended to marry my son Dale. She also asked me if I thought he would agree to adopt her biracial nephews. I told her he would have no problem with that since we also have biracial children in our family. I have been with my son when he has purchased clothes and other items for Jordan. I specifically remember doing that at the St. Jude's thrift store in Louisa, Kentucky. It is my understanding that Jordan James was on my son's lease as far back as 2015. I know Jordan received mail there. I was also present when K.G.'s mom came to pick up her things and she was visibly upset. I was with K.G. when she sold her old cell phone. She said she had to get rid of it. She said she had done some bad things on it and needed it gone.

(Trial Tr. Day 4, R. 216, Page ID#1630–31). The court instructed the jury to treat the stipulation as it would any witness testimony and noted that while both parties agree that it represents what Bonnie Fraley would have testified to, the government did not stipulate that it constitutes truthful

testimony.  The jury deliberated for about two and a half hours before returning a verdict of guilty

on the remaining eleven charges[4] in the superseding indictment.

At sentencing, Fraley had a total offense level of 43 and the maximum penalty for all the

counts of conviction amounted to 3,120 months or 260 years.  The court imposed a total sentence

of 684 months on all counts and a life term of supervised release after imprisonment.

## II.    STANDARD OF REVIEW

A district court's decision to deny a motion to continue a trial is reviewed for abuse of

discretion.  *See United States v. Warshak*, 631 F.3d 266, 298 (6th Cir. 2010).  A denial of a motion

for a continuance is an abuse of discretion only if the district court unreasonably and arbitrarily

insists "upon expeditiousness in the face of a justifiable request for delay."  *Id.* (quoting *United*

*States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985)).  A defendant must show that the denial of

the motion for a continuance prejudiced him "by showing that the continuance would have made

[a] relevant witness[] available or added something to the defense."  *United States v. King*, 127

F.3d 483, 487 (6th Cir. 1997).  There is no "mechanical test" for determining when a continuance

is warranted; the court must evaluate the circumstances of the case, "particularly in the reasons

presented to the trial judge at the time the request is denied."  *United States v. Garner*, 507 F.3d

399, 408 (6th Cir. 2007) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 588–91 (1964)).

## III.    ANALYSIS

Fraley argues that the district court's denial of his motion for a continuance violated his

Fifth Amendment right to due process and his Sixth Amendment right to prepare an adequate

defense because it prevented him from presenting his mother's live testimony in support of his

---

[4] Count 14 of the superseding indictment had been severed for a bifurcated trial, while Counts 6 and 12, for producing and receiving child pornography, were dismissed on the first day of trial upon the government's motion.

defense. Fraley argues that the continuance would have made a relevant witness available and would have added to his defense by permitting him to "more persuasively raise[] reasonable doubt to a key portion of the government's case; that the other personas were not real people and that he in fact acted as each of them." (Appellant's Br. at 19).

Although there are no "mechanical tests" for determining when the denial of a continuance violates due process, courts consider several non-dispositive factors, including:

> the length of the requested delay; whether other continuances had been requested and granted; the convenience or inconvenience to the parties, witnesses, counsel and the court; whether the delay was for legitimate reasons or whether it was "dilatory, purposeful or contrived;" whether the defendant contributed to the circumstances giving rise to the request; whether denying the continuance will result in identifiable prejudice to defendant's case; and the complexity of the case.

*United States v. Parker*, 403 F. App'x 24, 26 (6th Cir. 2010) (quoting *Powell v. Collins*, 332 F.3d 376, 396 (6th Cir. 2003)).

The district court properly found that the balance of the factors weighed against granting Fraley's motion for a continuance. The district court denied the motion to continue on several grounds: the trial had been continued multiple times; the victims had a right to a speedy trial; a continuance could prejudice the government given the availability limitations of several witnesses; and there were other ways the "testimony can be preserved and used." (Mot. Hr'g Tr., R. 208, Page ID#1026–27). Although Fraley only requested a month-long continuance, Fraley had requested three prior continuances to adequately prepare for trial. Furthermore, the continuance of a few weeks would have meant that trial would be delayed months to accommodate the availability of the government's counsel and other witnesses, including the government's expert and one of the victims.

The trial court was permitted to consider, among other factors, the rights of the victims to a speedy trial pursuant to 18 U.S.C. § 3771(a)(7), particularly since the victims also took the stand

as witnesses. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983) (noting that "in the administration of criminal justice, courts may not ignore the concerns of victims. . . especially so when the crime is one calling for public testimony about a humiliating and degrading experience such as was involved here"). Although the Defendant did not contribute to the circumstances giving rise to the request for the continuance, the granting of the continuance would have impacted the victims' rights. *See id.*

Furthermore, the district court did not abuse its discretion in determining that Fraley was not prejudiced by the continuance, since the continuance likely would not have made his mother available to testify and since his mother's testimony was preserved and presented to the jury through a stipulation. In denying the motion for a continuance and urging the parties to reach an agreement on a stipulation, the district court noted the strong likelihood that Bonnie Fraley would not be ready for trial by June 21, 2021, given the doctor's description of her health status. The court stated: "[b]ased upon what this doctor said, no disrespect to her husband or her son, sounds to me like June 21[, 2021] would be—that's a date that probably would need to be moved again." (Mot. Hr'g Tr., R. 208, Page ID #1028).

The doctor's note did not indicate when, if ever, his mother would be able to testify, and Fraley's counsel did not argue before the trial court, nor does he assert on appeal, that Bonnie Fraley would have been able to testify by June 21, 2021. While it is undisputed that Fraley's mother possessed relevant testimony, the district court did not abuse its discretion in denying a motion for a continuance where counsel did not show a probability that Bonnie Fraley would be able to testify at a later date. *See United States v. Sawyers*, 902 F.2d 1217, 1219 (6th Cir. 1990) (finding no abuse of discretion for denial of continuance where defendant did not show any probability that witness would be able to testify within a reasonable time); *United States v. Phillips*,

630 F.2d 1138, 1144 (6th Cir. 1980) (finding no abuse of discretion for denial of continuance where witness became mentally incompetent since the court "was confronted with a very indefinite prognosis, with no firm indication as to when, if ever, [potential witness] would be competent to be a witness"); *Scholl v. Felmont Oil Corp.*, 327 F.2d 697, 700 (6th Cir. 1964) (finding no abuse of discretion in trial court's denial of motion for a continuance where trial had been continued three times and affidavits of doctors in support of continuance did not indicate when ailing witness would be available to testify at trial).

Furthermore, Fraley has not shown that his mother's live testimony would have added anything to his defense. After considering the facts of the case, the district court determined that the stipulation provided the benefit of Bonnie Fraley's live testimony without the negative repercussions of cross-examination. Fraley argues that his mother's live testimony would have: corroborated his defense that Jordan James was a real person; contradicted, in part, some of the statements made by K.G. and A.P.; and supported the defense's theory that Fraley was set up by the girls. The stipulation read to the jury discusses each of those points since it notes that Bonnie Fraley met and spoke with Jordan James, states that Bonnie Fraley spoke with K.G. about Jordan James, discusses K.G.'s purported admission to Bonnie Fraley that she did bad things on a cell phone that she had to get rid of, and notes that K.G.'s mother was upset when picking up K.G.'s things from Fraley's house.

On appeal, Fraley does not include any additional information to which Bonnie Fraley would have testified, and merely argues that the live testimony "could have more persuasively raised reasonable doubt" as to the government's case that the personas were not real people. (Appellant's Br. at 18–19). The defendant carries the burden, on appeal, of showing that a continuance would have added to his defense, and the showing of actual prejudice "must be made

with specificity." *Parker*, 403 F. App'x at 28 (quoting *United States v. Harris*, 308 Fed. App'x 932, 938 (6th Cir. 2009)). Mere speculation that witnesses would have supported the defense, without a specific articulation of the "evidence the additional potential witnesses would offer," is insufficient to demonstrate prejudice. *United States v. Pacheco*, 466 F. App'x 517, 522 (6th Cir. 2012). Fraley's argument that Bonnie Fraley's live testimony would have been more persuasive is insufficient to meet his burden since Fraley does not detail any specific points that would have been relayed to the jury had his mother testified at trial. *See United States v. Harris*, 658 F. App'x 228, 231 (6th Cir. 2016) (finding no abuse of discretion and no constitutional violation where court denied continuance because trial had been continued twice before and where expert's report was admitted and the "the core of what she would have testified about was presented to the jury").

Furthermore, other circuits addressing similar cases have found no abuse of discretion in the denial of a continuance where a stipulation as to the witness' expected testimony was read to the jury. *See United States v. Webb*, 311 F. App'x 582, 585 (4th Cir. 2009) (finding no abuse of discretion where district court denied continuance when a character witness was unavailable because district court permitted stipulation as to witness' expected testimony to be read to the jury); *United States v. Alvarez*, 591 F.2d 10, 11–12 (5th Cir. 1979) (finding no abuse of discretion in district court's decision to deny continuance where stipulation read to the jury was more favorable than what witness would have testified to). While defendants are generally entitled to call key witnesses to give live testimony, *see Harris*, 658 F. App'x at 231, the district court here did not abuse its discretion since the stipulation provided Fraley with support for his defense without the possibility of an attack on his mother's credibility by the government. The entry of the stipulation avoided the potential for impeachment by cross-examination about Bonnie Fraley's bias as the Defendant's mother and about the fact that Bonnie Fraley drove A.P., a minor, back to

- 12 -

school after finding her at Defendant's house in the middle of the day after he had sexually abused her.

Because Fraley has not shown that the continuance would have made his mother available to testify and because her testimony would not have added anything to his defense beyond what was presented to the jury in the stipulation, the district court did not abuse its discretion in denying Fraley's motion to continue the trial.

## IV.    CONCLUSION

For the reasons stated above, we **AFFIRM** the district court's judgment.